No. 15,011:

RAY *v*. CITY AND COUNTY OF DENVER ET AL.
(121 P. [2d] 886)

Decided January 26, 1942.

Messrs. Van Cise, Robinson & Charlton, Mr. J. E.
Robinson, Mr. Fred M. Winner, of counsel, for plaintiff
in error.

Mr. Malcolm Lindsey, Mr. Robert J. Kirschwing,
Mr. Wayne D. Williams, for defendants in error.

. *En Banc.*

Mr. Justice Knous delivered the opinion of the court.

The sole question presented on this review is whether
Denver ordinance No. 49, Series 1941, passed June 2,
1941, is invalid by reason of its alleged conflict with the
state law (chapter 157, S.L. 1935; sections 6 to 21 inclu-
sive, chapter 88, '35 C.S.A.), concerning interest rates
and charges on loans of $300 or less each. In a declara-
tory judgment action instituted by plaintiff in error, to
whom we shall hereinafter refer as plaintiff, the dis-
trict court adjudged that no conflict existed and held
the ordinance valid. The complaint alleged that the
plaintiff, as a licensee under the state law, was engaged
in the business of making loans of the type above speci-
fied, in Denver; asserted that the statute controlled the
rate of interest and charges which might be made law-

fully on such loans everywhere in the state, including all municipalities therein, and that by decreasing such permissible total charges in Denver, as concededly was the result thereof, the ordinance forbade that which the legislature had authorized and licensed and so fatally conflicted with the state law.

The city, as we shall hereinafter designate defendants in error collectively, contended, as was the view of the district court, that the statute instead of conferring legal authority upon plaintiff to collect the interest and charges specified therein, merely fixed a maximum therefor which the city, in the proper exercise of its police power, might lower, but could not raise, without creating a conflict with the state law. It is to be observed that the city claims no special or exclusive power in this legislative field by reason of the Twentieth Amendment to the Constitution or otherwise, and does not question that the statute is a general law of the state operative with equal force within its entire confines, but rests its case solely upon the premise that the ordinance is not in conflict with the state law in a legal sense.

·[■■ Both parties agree, as is a fundamental principle, that an ordinance which is in conflict with a state law of general character and state-wide application is invalid. *Glendinning v. Denver*, 50 Colo. 240, 114 Pac. 652. See, also, 37 Am. Jur., p. 787, §165; 43 C.J. 215, §219; McQuillin on Municipal Corporations (2d ed.) vol. 2, p. 697, §683. As the legal basis for its position the city cites that, in considering the application of this fundamental principle, the courts many times have held the mere fact that the state in the exercise of its police power has made certain regulations, does not prohibit the municipality from exacting additional requirements (See, *Provident Loan Society v. Denver*, 64 Colo. 400, 172 Pac. 10; 37 Am. Jur. 790, §165; 43 C.J. 219, 220, §220), and asserts that the reduced rates to be charged on small loans in Denver under the promulgations of the ordinance are no more

than additional requirements to the coexisting prohibitions of the statute. Plaintiff expresses no disagreement with this legal theorem but argues that instead of prescribing sanctioned "further prohibitions" to the state law, the ordinance actually proscribes what the statute authorizes a licensee thereunder to do. Thus the problem presented on this review primarily does not result from disagreement between the parties as to the adjudicated law, but arises rather in the application of the established principles to the facts and circumstances of this case. A number of authorities have prescribed tests for the determination of the existence of a conflict, as in *State v. Carran*, 133 Ohio St. 50, 11 N.E. (2d) 245, where, following the pronouncement in *Village of Struthers v. Sokol*, 108 Ohio St. 263, 140 N.E. 519, it is stated: "In determining whether an ordinance is in 'conflict' with general laws, the test is whether the ordinance permits or licenses that which the statute forbids and prohibits, and vice versa." In 43 C. J., p. 219, §220(b), we find the following statement: "In order that there be a conflict between a state enactment and a municipal regulation both must contain either express or implied conditions which are inconsistent and irreconcilable with each other." The scope within which the principle upon which the city relies has been held applicable is well defined in the following sentence from 37 Am. Jur., p. 790, §165: "Thus, where both an ordinance and a statute are prohibitory and the only difference between them is that the ordinance goes further in its prohibition, but not counter to the prohibition under the statute, and the municipality does not attempt to authorize by the ordinance what the legislature has forbidden or forbid what the legislature has expressly licensed, authorized, or required, there is nothing contradictory between the provisions of the statute and the ordinance because of which they cannot coexist and be effective."

Hence, as the criterion of destructive conflict, under

either the basic rule or the principle invoked by the city, it seems evident that in the final analysis the courts revert to the determination of what might be called the factual question of whether the ordinance forbids the doing of a thing which the statute authorizes. Since the challenged ordinance, as was its purpose, forbade the collection in Denver of the charges specified in the state law, the resolution of the question submitted necessarily hinges upon the ascertainment of whether the state law conferred authority, as a matter of right, on licensees thereunder to collect the charges therein designated, or whether, as the city contends, the statute merely fixed the regulatory ceiling for such rates below which it was free to impose more strict requirements. On the basis of the provisions of the statute and the decisions of this court and others hereinafter to be mentioned, we are convinced that the state law created the situation claimed by plaintiff, as a result of which his contention must be upheld.

The statute in concern is entitled: "An Act relating to the making of loans or advancements of Three Hundred Dollars or less; Regulating the business of making such loans; Providing for administration of this act and for penalties for the violation hereof and repealing all acts or parts of acts in conflict herewith."

Section 1 prohibits the making of loans within such class at a greater rate of interest than ten per cent per annum, *"except as authorized* by this act and without first obtaining a license from the State Bank Commissioner * * *."* Section 2 prescribes the contents of the application for license; specifies that in cities of more than 20,000 population the applicant must furnish proof of "liquid assets of at least $25,000" and $5,000 in cities of less population, and fixes the annual license fee at $50.00. Section 3 provides for the giving of a bond of $1,000 by every licensee. Section 4 relates to the issuance of the license which "shall not be assignable." Sections 5, 6, 7, 8 and 9 respectively require a display of

the license; a license for each place of business; written notice by licensee of a change of place of business; gives bank commissioner power to investigate loans; and exacts that licensees keep books and records for inspection by the licensing authority. Section 10 provides that every licensee "may loan any sum * * * not exceeding in amount the sum of three hundred dollars ($300) in any single transaction *and may charge, contract for and receive*" interest and a service fee at the rate and in the percentages therein stated. This section further provides that no service fee shall be charged unless the loan is made, and declares: "interest or charges in excess of those permitted by this act" may not be collected. Section 11 requires the licensee to deliver a statement to the borrower and the cancellation and return of all notes upon payment. Section 12 prohibits a licensee from taking notes or instruments in which blanks are left to be filled after execution. Section 13 stipulates: "No person, co-partnership, or corporation, *except as authorized by this Act,* shall directly or indirectly, charge, contract for, or receive any interest, charge or consideration greater than ten (10) per centum per annum upon the loan, use, or forbearance of money, goods, or things in action, or upon the loan, or use of money, of the amount or value of three hundred dollars ($300.00) or less * * *. No loan, for which a greater rate of interest or charge than is allowed by the Act has been contracted for or received from and after the passage of this Act, shall be enforced in this State." Section 14 exempts banks, trust companies, building and loan associations, credit unions and licensed pawnbrokers from the operation of the Act. Sections 15, 17, 18, 19 and 20 respectively, are the repealing, penalty, severability, safety and emergency clauses. Section 16 makes the act inapplicable in cases where money loaning is regulated by state or federal legislation.

 In view of the scope and comprehensive terms of this enactment, it is difficult to conceive that the in-

tention of the state lawmakers with respect to the subject was other than to occupy the whole legislative field concerning it. That such a statute, as its express terms presage, *grants a right* to do the things provided therein to one authorized by license thereunder is established by our decision in *Gronert v. People,* 95 Colo. 508, 37 P. (2d) 396. In that case the question of the constitutionality of the money lenders' act of 1919 (chapter 159, S.L. 1919) was before us. In form the body of that act was very similar to the statute here involved and unquestionably was passed with the same legislative purpose. In holding the 1919 act unconstitutional because its purpose as expressed in the title was changed by the amendment of the bill during its passage, we stated: "The purpose of the bill, as introduced, was to license the business of making small loans *at a greater rate of interest than twelve per cent per annum,* and to regulate such business. A license is a permit to do a certain thing; it confers a right to do that which without the license would be unlawful. *Parsons v. People,* 32 Colo. 221, 76 Pac. 666; *Antlers Athletic Association v. Hartung,* 85 Colo. 125, 274 Pac. 831; *People v. Raims,* 20 Colo. 489, 39 Pac. 341; *Board of Commissioners v. Mayr,* 31 Colo. 173, 74 Pac. 458; *Schwartz v. People,* 46 Colo. 239, 104 Pac. 92. The amendment of section 13 changed the original purpose of the bill so as to *forbid* the licensing and regulating the business of making small loans at interest *greater* than one per cent per month. The statute, instead of regulating the business described in the title, prohibits it, * * *." If the amendment mentioned in the opinion was in such conflict with the right promised by the title as to invalidate the act, it would seem apparent that a municipal ordinance transgressing the same right conferred by a valid statute is in conflict with it. Consistently, and directly in point in support of plaintiff's contention here, it was held in *Solomon v. Denver,* 12 Colo. App. 179, 55 Pac. 199, that where a state law provided for the licensing of pawnbrokers and authorized

a licensee to make charges of ten per cent per month on loans of $5.00; of five per cent monthly on loans between $5.00 and $50.00, and on all sums of $50.00 or more, three per cent per month, an ordinance of Denver which lessened such statutory rates to a maximum of three per cent per month on all loans was invalid. On this point the opinion states: "The inconsistency between the ordinance and the act is better illustrated by the consideration of the provisions with reference to interest than in respect to any other matter. According to the ordinance the pawnbroker could in no case charge more than three per cent per month, and for a violation of that provision of the ordinance a penalty was prescribed. This is in clear and distinct opposition to the provisions of the general act. Acts of 1893, p. 360." In an attempt to avoid the adverse effect of this language, the city argues that the Solomon case was decided upon another ground, as a result of which it is said the quoted excerpt is obiter dictum. We think even a casual examination of the opinion in the case will disclose that the issue of alleged conflict between the ordinance and the statute was of major consideration in disposing of the question. The circumstance, if true, that the Solomon case has never been cited as an authority, does not detract from its decisive effect, and we do not believe the doctrine as there announced was impliedly rejected in the case of *Provident Loan Society v. Denver, supra,* as we shall hereinafter demonstrate.

The cases cited by the city on this question are not in point in this controversy, since in none of them did the state law, as does the statute here, license and authorize the doing of the thing which the ordinance attempted to forbid but, on the other hand, merely fixed a statutory maximum of prohibition of certain conduct within those jurisdictions. An example is the case of *City of Bellingham v. Cissna,* 44 Wash. 397, 87 Pac. 481, upon which the city principally relies. The state law of Washington limited the maximum speed of automobiles to twelve

miles per hour, while a section of the statute provided that no one should drive a car "at any speed greater than is reasonable and proper." The City of Bellingham enacted an ordinance fixing a maximum speed of *six* miles per hour in certain of its congested areas. The Supreme Court of Washington upheld the ordinance as against the contention that it was in conflict with the state law. In part, the opinion stated: "This section [referring to the section on reasonable speed] was undoubtedly included in the act for the purpose of requiring drivers of automobiles to reduce their speed when necessary to even less than twelve miles per hour. * * * The legislature evidently intended that they might be subjected to like rules and regulations by the local authorities, in so far as the same might be practical." A similar conclusion with respect to a generally analogous situation was reached by the Supreme Court of Nebraska, as appears from its opinion in *Christensen v. Tate,* 87 Neb. 848, 128 N.W. 622. Another in this line of cases is *Kansas City v. Henre,* 96 Kas. 794, 153 Pac. 548. The Kansas statute required not less than 11¾ per cent solids in milk, while the municipal ordinance, which was challenged, required not less than 12 per cent in Kansas City. On substantially the same considerations announced in *Bellingham v. Cissna, supra,* the ordinance was held valid. The remaining cases cited by the city including *In re Hoffman,* 155 Cal. 114, 99 Pac. 517, generally fall within the same category as those last mentioned. It seems clear that no conflict existed in such instances because, by merely putting a top limit on a course of conduct, these statutes did not authorize its citizens to perform acts within the limit. The Washington legislature did not license its automobile operators to drive twelve miles per hour; it only said that its citizens could not drive at a speed *in excess* of twelve miles per hour, and it recognized that in certain areas they could not drive faster than was reasonable. By the same token the state of Kansas did not confer a right to sell milk

with only a solid content of 11¾ per cent; rather it said that milk with a lesser solid content could not legally be sold.

The case of *Provident Loan Society v. Denver, supra,* while cited by the city in support of its contention, in reality emphasizes the distinction we have stressed. There the state law regulating the business of pawnbroking, defined pawnbrokers as those charging as much as *three per cent per month* as interest on loans on personal property. The Denver ordinance required a city license from *all pawnbrokers* regardless of the rate of interest charged by them. The Provident Loan Society was a pawnbroker which charged interest on its loans at rates not exceeding *two per cent per month.* In a prosecution for failure to procure a city license, the society claimed the ordinance conflicted with the statute. We held that since the state had not attempted to regulate the business of pawnbroking where the rate of interest charged was less than three per cent per month, the city legitimately might require a license from pawnbrokers lending money at a less rate of interest than that fixed by the statute. As disclosing the inapplicability of that rule to a case where the statute inclusively conferred licensed authorization, we said: "If the statute had provided that no license should be imposed on pawnbrokers except those charging the maximum of 3% per month interest, then there might have been a conflict between the statute and the ordinance, but no such provision appears in the statute, nor can it be implied from the language thereof."

The ordinance involved in *Interstate Business Exchange v. Denver,* 68 Colo. 318, 190 Pac. 508, which imposed a city license tax upon employment agencies, also licensed by the state, was upheld as "an exercise of the power to tax for the purpose of revenue." That ordinance forbade the doing of nothing permitted by the state law, and the considerations leading to the decision were foreign to the question here involved.

█ Even should we agree with the plea of counsel for the city as to the social justification for the reduced rates of interest on small loans as attempted in Denver by the ordinance, we may not, by judicial construction, repeal a law that has been regularly enacted and which is stated in clear and unambiguous terms by the legislative branch of our state government. "If the law requires to be remedied that is a question for the legislature." *Chicago Title and Trust Co. v. Patterson,* 65 Colo. 534, 178 Pac. 13.

The judgment is reversed and the cause remanded with directions to enter judgment in accord with the views herein expressed.

MR. JUSTICE BOCK dissents.

MR. JUSTICE JACKSON did not participate.