**CITY OF NORTHGLENN,**
Petitioner/Cross–
Respondent,

v.

**Juliana IBARRA, Respondent/Cross–**
Petitioner.

No. 01SC245.

Supreme Court of Colorado,
En Banc.

Jan. 13, 2003.

Hayes, Phillips, Hoffmann & Carberry, P.C., Herbert C. Phillips, Corey Y. Hoffmann, Denver, Colorado, Attorneys for Petitioner.

Holland & Hart LLP, Gregory A. Eurich, Jim Goh, Alison A. Montague, Kimberly A. Dempster, Denver, Colorado, American Civil Liberties Union Foundation of Colorado,

Mark Silverstein, Denver, Colorado, Attorneys for Respondent.

Kelly Haglund Garnsey Kahn LLP, David R. Fine, Denver, Colorado, Amici Curiae for the Colorado Association of Family and Children's Agencies and the CPA Network.

Gorsuch Kirgis LLP, Carmen Beery, Denver, Colorado, Amicus Curiae for the City of Wheat Ridge.

Gorsuch Kirgis, LLP, Paul F. Kennebeck, Denver, Colorado, Amicus Curiae for the City of Lakewood.

Colorado Municipal League, Geoffrey T. Wilson, Denver, Colorado, Amicus Curiae for the Colorado Municipal League.

Hayes, Phillips, Hoffmann & Carberry, P.C., Herbert C. Phillips, Corey Y. Hoffmann, Denver, Colorado, Amicus Curiae for the State of Colorado.

Justice BENDER delivered the Opinion of the Court.

## I. INTRODUCTION

In this case we determine the enforceability of Northglenn's Ordinance 1248, which prohibits registered sex offenders from living together in a single-family residence in Northglenn. We hold that state law preempts Ordinance 1248 as it applies to a particular subset of registered sex offenders: adjudicated delinquent children whom the state places and supervises in state-created foster care families. Neither the Colorado Constitution nor state statutes grant Northglenn the power to regulate this matter of statewide concern.

The trial court convicted and fined the respondent, Juliana Ibarra, pursuant to Ordinance 1248 because she provided a foster home for three unrelated adjudicated delinquent children who were also registered sex offenders. On appeal, the district court invalidated Ordinance 1248 and reversed Ibarra's conviction, ruling that the ordinance discriminates on the basis of familial status in violation of the federal Fair Housing Act, 42 U.S.C. § 3601, and violates Ibarra's right to freedom of association and the right to personal choice in matters of family life. We affirm the judgment of the district court but employ different grounds.

Although Northglenn has an interest in regulating the way that land is used in its community, Ordinance 1248 is not the typical land use ordinance because it also regulates the placement and movement of adjudicated delinquent children in state-created families. Considering the totality of the circumstances, we hold that the state's interest in fulfilling its statutory obligations to place and supervise delinquent children in state-created foster care families in a uniform manner overrides any city interest in regulating land uses. Because our holding that state law preempts Ordinance 1248 as applied to adjudicated delinquent children in foster care disposes of this case, we do not reach the questions of whether Ordinance 1248 violates the Fair Housing Act or Ibarra's right to freedom of association and the right to personal choice in matters of family life.

Thus, we affirm the decision of the district court and return this case to it with directions to remand the case to the trial court for dismissal in accordance with this opinion.

## II. FACTS AND PROCEEDINGS BELOW

For the last fifteen years, Respondent Juliana Ibarra and her husband, Eusebio, have provided foster care services to children in their single family residence in the City of Northglenn. The Ibarras are certified by Lost & Found, Inc., a child placement agency licensed by the State of Colorado. Juliana Ibarra underwent almost ninety hours of specialized training to maintain her certification with Lost & Found, taking classes on various topics including some related to parenting the sexually violated child and/or perpetrator.

In January 2000, Northglenn enacted Ordinance 1248. Section 11-5-2(b)(58) of the ordinance prohibits unrelated, registered sex offenders from living together in a single family home in residential zones in the City of Northglenn.[1] The ordinance also provides

---

1. Specifically, the ordinance amended the definition of "family." The new language, as empha-

that violation of section 11–5–2(b)(58) is a crime and can result in up to one year in jail and/or a fine of $1,000 per day.

At the time that the ordinance became effective, the Ibarras shared their home with four unrelated foster children. Three of those four foster children had been the victims and perpetrators of incest and suffered various mental impairments.[2] Because of adjudications resulting from that incestuous conduct, these three youths were also required to register as sex offenders pursuant to section 18–3–412.5, 6 C.R.S. (2002).[3] The state removed the three children from their parents' homes and placed them with the Ibarras through Lost & Found.[4] In 2000, the oldest of the three children had lived with the Ibarras for three years, the middle child had lived there for one year, and the youngest had been with the Ibarras for approximately four months.[5]

Because the Ibarras continued to share their home with three unrelated adjudicated delinquent children who were also registered sex offenders after the effective date of Ordinance 1248, Northglenn charged Juliana

Ibarra with a violation of section 11–5–2(b)(58). Ibarra was convicted of violating Ordinance 1248 and fined $750.

Ibarra appealed to the Adams County District Court, which reversed the trial court, based on its conclusion that the ordinance discriminates on the basis of familial status in violation of the federal Fair Housing Act, 42 U.S.C. § 3601, and violates Ibarra's right to freedom of association and the right to personal choice in matters of family life. With respect to Ibarra's preemption argument, the district court concluded that Ordinance 1248 is a zoning ordinance that attempts to regulate the use of property, and as such, is a matter of purely local concern.

We granted certiorari to resolve questions related to whether Ordinance 1248 discriminates in violation of the federal Fair Housing Act, whether Ordinance 1248 violated Ibarra's right to freedom of association and right to personal choice in matters of family life, and whether the City of Northglenn exceeded its home-rule powers by enacting Ordinance 1248.[6]

sized below, prohibits two or more unrelated or unmarried registered sex offenders from living together:

> *Family.* A group of persons related by blood, marriage, or adoption, living together and normally, but not always consisting of one or two parents and their children, or persons living together in the relationship and for the purpose of guardian, ward or foster family who may not necessarily be related by blood or marriage to the head of the household, or a group of not more than four unrelated persons living together in a dwelling unit, *except that a family shall not include more than one individual, (or two or more individuals related by blood or marriage), required to register as a sex offender under the provisions of C.R.S. § 18–3–412.5, as amended.*

§ 11–5–2(b)(58)(emphasis added).

2. The record reveals that children who commit sexual offenses often have an underlying mental impairment that is rooted in childhood mental disturbances.

3. Section 18–3–412.5 provides that any person who is required to register as a sex offender pursuant to sections 16–22–101 to 16–22–114, 6 C.R.S. (2002), but fails to do so, commits the offense of failure to register as a sex offender. Sections 16–22–101 to 16–22–114 constitute the Colorado Sex Offender Registration Act and delineate who must register as a sex offender and for what offenses. Each child was registered

pursuant to the Act, either as a result of adjudication or deferred adjudication, for the following: incest (oldest child); aggravated incest (middle child); and incest with a minor (youngest child).

4. Two of the three children came to the Ibarras from a *state-licensed residential treatment center* because they demonstrated the ability to function in and benefit from a less restrictive home-setting.

5. In 2000, two of the foster children were 17 and one was 18. All three were still in school. Ordinarily in Colorado, foster care terminates when the child reaches age 18. § 26–6–102(4.5), 8 C.R.S. (2002). However, foster care can continue until the child reaches age 21 in appropriate circumstances. § 26–6–104(6). The Ibarras are certified by Lost & Found to provide foster care for children until they reach 21.

6. The precise questions upon which we granted certiorari are:
 (1) Whether the District Court erred in finding that Northglenn Ordinance No. 1248 discriminates on the basis of familial status in violation of the Federal Fair Housing Act, 42 U.S.C. § 3601 *et seq.*
 (2) Whether the District Court erred in finding that Northglenn Ordinance No. 1248 violated Defendant's right to freedom of association and the right to personal choice in matters of family life.

We hold that Ordinance 1248, to the extent that it regulates the number of adjudicated delinquent children that may reside in a particular foster home, is a matter of statewide concern and is preempted. Because this conclusion regarding the home-rule issue is dispositive, we do not reach the other issues presented.

## III. ANALYSIS

The law that applies to this case is well-established and the parties do not debate its general contours. Article XX, Section 6 of the Colorado Constitution, adopted by Colorado voters in 1912, granted "home-rule" to municipalities opting to adopt home-rule charters. Colo. Const. art. XX, § 6. The effect of this constitutional provision is that certain cities, which have satisfied size requirements and adopted a city charter, may legislate on matters of local concern that preempt any conflicting state legislation. *Id.*

We have recognized that regulated matters fall into one of three broad categories: (1) matters of local concern; (2) matters of statewide concern; and (3) matters of mixed state and local concern. *City of Commerce City v. State,* 40 P.3d 1273, 1279 (Colo.2002). The decision as to whether state or local legislation controls in a given situation often turns on whether a matter is a local, state or mixed concern.

## A. To Determine Whether a Home-Rule City May Legislate a Matter, We Must Consider Whether the Matter is a Local, State, or Mixed Local and State Concern

 Whether a matter is of local, state or mixed concern determines who may legislate in that area. First, in matters of local concern, both home-rule cities and the state may legislate. *See, e.g., id.* However, when a home-rule ordinance or charter provision and a state statute conflict with respect to a local matter, the home-rule provision supercedes the conflicting state statute. *Id.* Second, in matters of statewide concern, the General Assembly may adopt legislation and home-rule municipalities are without power to act unless authorized by the constitution or by state statute. *Id.* Third, some matters are not exclusively of local or statewide concern, but are properly of concern to both home-rule cities and the state. In these matters of "mixed" concern, local enactments and state statutes may coexist if they do not conflict. *Id.*

While we have found the terms "local," "state," and "mixed" useful to resolve potential conflicts between local and state legislation, they are not "mutually exclusive or factually perfect descriptions of the relevant interests of the state and local governments." *City and County of Denver v. State,* 788 P.2d 764, 767 (Colo.1990). Oftentimes, matters are not exclusively of local, state, or mixed concern and imperceptibly merge or overlap. *Id.* To determine that a matter is of local, state, or mixed concern is to draw a legal conclusion based on the facts and circumstances of each case. *Id.* At times, we may conclude that a matter is of statewide concern even though there exists a relatively smaller, local interest. Thus, even if the locality may have an interest in regulating a matter to the exclusion of the state under its home-rule powers, such an interest may be insufficient to characterize the matter as being of even "mixed" state and local concern. *C.f., id.*

## B. To Determine Whether a Matter is a Local, State, or Mixed Local and State Concern Depends on the Totality of the Circumstances

We have not developed a specific test that dictates this process of analyzing whether a matter is of local, state, or mixed concern. *Commerce City,* 40 P.3d at 1280. Instead, we have made this determination on an ad hoc basis, considering the totality of the circumstances. *Id.* at 1279–80.

(3) Whether the District Court erred in failing to conclude that Ordinance No. 1248 exceeds the Home Rule powers of the City of Northglenn because the place of residence of foster children is a matter of purely statewide concern, or at a minimum a matter of mixed state and local concern and Ordinance 1248 conflicts with the provisions of the Colorado Children's Code.

We have identified several general factors to be considered when determining whether a matter is of state, local, or mixed concern, including the need for statewide uniformity, whether the municipal legislation has an extraterritorial impact, whether the subject matter is traditionally one governed by state or local government, and whether the Colorado Constitution specifically identifies that the issue should be regulated by state or local legislation. *Id.* at 1280; *Town of Telluride v. Lot Thirty–Four Venture, LLC,* 3 P.3d 30, 37 (Colo.2000); *Denver,* 788 P.2d at 768. This is not an exhaustive list. All of these factors are "directed toward weighing the respective state and local interests implicated by the law," *Telluride,* 3 P.3d at 37, a process that lends itself to flexibility and consideration of numerous criteria. Thus, we have at times considered other factors as relevant to our consideration of whether a subject matter is of state, local, or mixed concern, including any legislative declaration as to whether a matter is of statewide concern and the need for cooperation between state and local government in order to effectuate the local government scheme. *Commerce City,* 40 P.3d at 1280; *Telluride,* 3 P.3d at 37.

When we consider these factors, we are weighing the respective interests of the locality and the state in regulating a particular matter. If we conclude that a matter is of statewide concern, we must consider whether the Constitution or state statutes provide specific authorization to the locality to legislate in this area. If there is no such explicit authorization, then our inquiry is over and the local law is preempted. It is not up to the court to make or weigh policy decisions that are the province of the General Assembly. *Telluride,* 3 P.3d at 38.

Having determined the appropriate legal standards from which to evaluate the interplay between local and state legislation, we now apply them to Northglenn's Ordinance 1248.

## IV. APPLICATION

To determine whether Northglenn may regulate the number of adjudicated delin-

quent children who may reside in one foster care home, we must ask whether the regulation of such children is a matter of local, state or mixed concern.[7] We answer that question by reviewing the totality of the circumstances and weighing the respective state and local interests implicated by this case.

■ Ultimately, we hold that Ordinance 1248, as it applies to adjudicated delinquent children in foster care homes, regulates a matter of statewide concern. The state's interest in fulfilling its statutory obligations to place and supervise adjudicated delinquent children in foster care homes pursuant to uniform, statewide criteria overrides any home-rule city's interest in controlling land uses within its territorial limits. As a result of this overriding statewide concern, Ordinance 1248 is preempted. To frame these issues and to better understand our reasoning, we review two Colorado statutes: the Colorado Sex Offender Registration Act and the Colorado Children's Code. These Codes provide the background for understanding the legal status of registered juvenile sex offenders living in foster care homes and the state's statutory obligations towards them.

### A. The Colorado Sex Offender Registration Act Applies to Adjudicated Juvenile Delinquents or Juveniles Receiving a Deferred Adjudication for Unlawful Sexual Behavior

The Act requires that any person who is convicted of unlawful sexual behavior, or another offense where the underlying factual basis of which involves unlawful sexual behavior, must register with the state as a sex offender. § 16–22–103(2)(a), 6 C.R.S. (2002). The Act defines unlawful sexual behavior to include a broad range of offenses, from a misdemeanor of unlawful sexual contact, § 16–22–102(9)(c)(I), to a felony of sexual assault on a child. § 16–22–102(9)(d). Juveniles can also commit unlawful sexual behavior that subjects them to the Act's registration requirements. Specifically, the Act

---

7. We consider the validity of Ordinance 1248 only as it applies to foster families. We do not address issues related to its validity when applied to registered sex offenders who are not placed by the state as foster children into foster homes.

requires registration of any person who is "adjudicated a juvenile delinquent" or receives a "deferred adjudication" based on the commission of an act that may constitute unlawful sexual behavior. § 16–22–103(4).

Although we have defined a subset of "registered sex offenders" under Colorado law that includes juveniles who are adjudicated delinquent or received a deferred adjudication for unlawful sexual behavior, that is not the end of our analysis. Northglenn applied Ordinance 1248 to adjudicated delinquent children who were also placed and supervised by the state into foster care homes. The status of such children implicates state statutory obligations under the state's juvenile justice system, found in Article 2 of the Colorado Children's Code.

### B. The Colorado Children's Code Mandates that the State Place and Supervise Adjudicated Delinquent Children in Foster Care Pursuant to Uniform Statewide Criteria and Procedures

Article 2 provides exclusive jurisdiction to the state's juvenile courts in proceedings concerning any juvenile who is ten years of age or older. § 19–2–104(1)(a), 6 C.R.S. (2002). The juvenile court may retain jurisdiction over a juvenile until all orders have been fully complied with, any pending cases have been completed, or the statute of limitations applicable to any offense charged has run, regardless of whether a person has attained the age of 18 years, and regardless of the age of such person. § 19–2–104(6). For any proceedings, the juvenile court must always consider the "best interests of the juvenile, the victim, and the community in providing appropriate treatment to reduce the rate of recidivism in the juvenile justice system and to assist the juvenile in becoming a produc-

tive member of society." § 19–2–102(1). The General Assembly has declared that it is in the best interests for children removed from their homes to have the following guarantees: to be placed in a secure and stable environment; to not be indiscriminately moved from foster home to foster home; and to have assurance of long-term permanency planning. § 19–1–102(1.5)(a).

Keeping in mind these statutory mandates, the juvenile court removes certain children from their homes through a number of routes. One such route is delinquency adjudication.[8] In the juvenile system, "adjudication" occurs when the juvenile pleads guilty to committing a delinquent act or it has been proven beyond a reasonable doubt to the trier of fact that the juvenile has committed a delinquent act. § 19–1–103(2). Before the court determines the most appropriate disposition for the adjudicated delinquent child, the Probation Department[9] conducts a presentence investigation and recommendation for a proposed treatment plan pursuant to specific procedures and criteria. § 19–2–905(1)(a).

For its investigation and recommendation, the Probation Department considers, among other things, the details of the offense, the juvenile's prior record if he or she has been adjudicated for an act that constitutes unlawful sexual behavior, the status of juvenile programs and community placement,[10] and the statewide placement and commitment criteria pursuant to § 19–2–212. Section 19–2–212(1)(a) requires that the Executive Director of the State Department of Human Services and the State Court Administrator establish statewide criteria for the placement of juvenile offenders. The purpose of the placement criteria is to promote a system through which the state makes outside placement decisions based upon a "more uniform set of criteria" throughout the state. _Id._[11]

---

8. Another route is through dependency and neglect proceedings, pursuant to Article 3 of the Children's Code. _See generally_ §§ 19–3–100.5 to 19–3–703.

9. The State Judicial Branch is responsible for the oversight of juvenile probation. § 19–2–202.

10. Community placement is the placement of a child in any state licensed or certified twenty-

four hour, non-secure, care and treatment facility away from the child's parent or guardian. § 19–1–103(24.5). Such facilities include, but are not limited to, foster care homes, group homes, or residential treatment centers. _Id._

11. For example, to order outside placement, the court must consider the least restrictive alternative while bearing in mind the issue of public safety. Specifically, under one criterion for

After the Probation Department's investigation and recommendation—which includes a consideration of the section 19–2–212 statewide placement and commitment criteria—the delinquent child proceeds to disposition.

■ For adjudicated delinquent children, the court has the exclusive jurisdiction to determine their disposition. *People ex rel. N.D.S.*, 5 P.3d 382, 383 (Colo.App.2000); *People in Interest of M.A.G.*, 732 P.2d 649, 651 (Colo.App.1986)(quoting *People in Interest of T.W.*, 642 P.2d 16, 17 (Colo.App.1981)). The court sentences the adjudicated delinquent child choosing from a list of statutory options. § 19–2–907.[12] Two of those options result in the state placing adjudicated delinquent children into foster care homes.[13]

First, the court commits certain adjudicated delinquent children to the State Department of Human Services, Division of Youth Corrections.[14] Once the court commits the child to the State Department of Human Services, the Department has the sole authority to make placement decisions for the child. § 19–2–909(2). *See Leidig v. Delaney*, 189 Colo. 186, 189, 539 P.2d 1264, 1266 (1975). The Department evaluates the child for the most appropriate placement while considering any pre-sentence investigations that rely on the section 19–2–212 statewide criteria for outside placement. §§ 19–2–922(1)(b), 19–2–906(1)(a), 19–1–107(3). The Department places the juvenile in a state facility, which can range from a locked facility to a foster care home. § 19–2–909(2).[15]

The Children's Code defines "foster care" as the placement of a child into the legal custody or authority of a County Department of Social Services for physical placement of the child in a certified or licensed facility. § 19–1–103(51.3). Although the State Department of Human Services is the state agency responsible for child welfare services, it administers these services through the counties. *See* Colorado's Human Services Code, §§ 26–1–111(f), 26–1–118(1),(5), 8 C.R.S. (2002). For these purposes, the counties are the subordinate agents of the State Department of Human Services. *Dempsey v. City and County of Denver*, 649 P.2d 726, 727 (Colo.App.1982).

For delinquent children committed to its custody and placed into one of its foster care homes, only the Department can change the initial placement decision and transfer children between its facilities. § 19–2–923(1). The Department conducts an administrative review every six months for as long as the juvenile remains in foster care under the placement of the Department. § 19–2–921(5).

In addition to a commitment to the Department of Human Services, the court can order juveniles directly to outside placement. § 19–2–907(1)(g). If the court finds that placement outside of the home is necessary and in the best interests of the juvenile and the community, the court must follow the section 19–2–212 statewide criteria to place the juvenile in the facility or setting that

placement, the court must find that: (1) the juvenile does not require a secure setting and is appropriate for community-based out-of-home placement; (2) the juvenile has committed an offense which may place the public at risk; (3) community resources that are appropriate and necessary to maintain the youth in his/her home are absent; and (4) the family home represents an immediate and continuing threat to the youth. *Criteria for Community–Based Out–of–Home Placement with the County Dep'ts. of Human/Social Services, Pursuant to Section 19–2–212, C.R.S.*, Adopted Oct. 10, 2002, Colorado Dep't of Human Services.

**12.** If the juvenile pled guilty, the court can defer adjudication with the consent of the district attorney and the juvenile. § 19–2–709(1). The court may order probation for the child and impose any conditions of supervision that it deems appropriate that are stipulated to by the

juvenile and the district attorney. § 19–2–709(2). The juvenile remains under the jurisdiction of the court until full compliance with all of its orders.

**13.** These options can also be part of a plea agreement for children who received deferred adjudications.

**14.** The Department of Human Services is the single state agency responsible for the oversight of the administration of juvenile programs and the delivery of services for juveniles and their families in this state. § 19–2–202.

**15.** The Department establishes and operates facilities necessary for the care, education, training, treatment, and rehabilitation of those juveniles legally committed to its custody. § 19–2–403(1). The Department also contracts with private agencies to provide these facilities. § 19–2–410(1).

most appropriately meets the needs of the juvenile, the juvenile's family, and the community. § 19–2–907(5)(a). One choice for outside placement is a state supervised and licensed child placement agency. §§ 19–2–907(1)(g), 19–1–103(21). Although the state—through its designee the County Department of Social Services—retains legal custody of the children, the agency determines where and with whom the children shall live, subject to court approval. § 19–1–115(3)(a). In appropriate circumstances, the child placement agency locates foster parents for the physical custody of the child.[16] The agency must find foster parents who can provide treatment that is in the best interests of the juvenile in a state environment where, as the legislature has found, there is an increasing difficulty of attracting foster parents to care for the number of children placed outside of their homes. § 26–5.5–102(c). When potential foster parents are located, the agency ensures that they comply with all statutory requirements, including receiving training through the statewide core curriculum. 12 C.C.R. § 2509–6. Foster parents may also receive specialized training that is designed to provide therapeutic treatment for the psychological or emotional needs of an individual child. 12 C.C.R. § 2509–8. These foster parents, as designees of the state, are certified by the child placement agency to provide twenty-four hour family care for the child in their home. § 26–6–102(4.5).

Following court-ordered placement in a foster care home, the court holds a hearing every six months after the sentencing hearing to review the initial placement decision. § 19–2–906.5(2)(a). At the review, the court makes specific determinations, including whether continued placement is in the best interests of the juvenile and the community and whether continued placement is necessary and appropriate. §§ 19–2–906.5(2)(a)(I),(IV).

In summary, the Colorado Children's Code mandates that for adjudicated delinquent children in foster care, the state—through either the court or the State Department of Human Services—must consistently follow specific criteria and procedures to protect the best interests of the juvenile and the community.

**C. By Regulating Adjudicated Delinquent Children Who Are Also State Placed and Supervised in Foster Families, Ordinance 1248 Regulates a Matter of Statewide Concern**

With Colorado statutes in mind, we must consider and weigh the state and local interests that are implicated by Ordinance 1248. Northglenn argues that Ordinance 1248 is a zoning ordinance and that we have repeatedly held that zoning ordinances are of local concern. Northglenn points out that from the very inception of zoning laws, the regulation of land uses has been a matter for local governments. Thus, Northglenn concludes that Ordinance 1248 must also be of purely local concern and valid pursuant to their home-rule powers. We disagree. Northglenn's argument fails to take into account the very real overlap between Ordinance 1248 and the state's obligations under the Children's Code.

As we acknowledged in *Telluride*, local laws may overlap with state laws, even though this is not clear from the language of either the local or state laws. In *Telluride*, we evaluated the overlap between a local ordinance requiring owners engaging in new development to mitigate the effects of that development by generating affordable housing units and a state statute prohibiting local municipalities from enacting "rent control" legislation. 3 P.3d at 32–33. The local statute did not require rent control for new development and the state statute did not define what constituted rent control. However, the local law, as applied, set maximum rental rates per square foot and capped rental rate increases for units designated as affordable housing. Considering this impact, we found that the local law constituted rent control and implicated the state statute. *Id.* at 35.

---

**16.** Lost & Found is such a child placement agency. The state, either through the State Department of Human Services and/or a court, placed

the three children at issue here with Lost & Found, who subsequently placed them into the physical custody of the Ibarras.

Here, Ordinance 1248 and the Children's Code superficially appear to regulate two different subject matters. Ordinance 1248 regulates the number of registered sex offenders who may live in a single-family residence in Northglenn. The Children's Code regulates the state's placement, movement and supervision of adjudicated delinquent children in foster care homes. On their face, there appears to be no overlap. However, the Colorado Sex Offender Registration Act provides the linking overlap: registered sex offenders are also adjudicated delinquent children, and in this case, living in a foster care home. In other words, Ordinance 1248, as applied, regulates a subset of registered sex offenders who are also covered by the procedures and protections granted to them by the Children's Code. By defining the term "family" in a way that restricts the number of adjudicated delinquent children who may reside with a foster care family, Ordinance 1248 necessarily implicates the state's statutory obligations with respect to those children.

Thus, because Ordinance 1248 was applied to a state-created foster care family, both local and state interests are implicated. The city has an interest in regulating the way that land is used in Northglenn and protecting the welfare of its citizens. The state has an interest in fulfilling its statutory obligation to place and supervise adjudicated delinquent children uniformly pursuant to the procedures and criteria of the Children's Code in a way that protects the best interests of the juvenile and the community. Hence, we must weigh the relative strengths of these interests to determine if Northglenn may regulate the number of adjudicated delinquent foster care children who may reside in one home. We do so by turning to and examining the totality of the circumstances.

### 1. The Need for Statewide Uniformity

■ We first analyze whether there exists a need for statewide uniformity in the regulation of registered sex offenders who are also adjudicated delinquent children in foster care homes. We find that our statutes create such a need.

Although uniformity in itself is no virtue, see Denver, 788 P.2d at 769 (quoting State ex rel. Heinig v. City of Milwaukie, 231 Or. 473, 479, 373 P.2d 680, 684 (1962), overruled on other grounds by City of La Grande v. Public Employees Retirement Bd., 281 Or. 137, 576 P.2d 1204 (1978)), we have found statewide uniformity necessary when it achieves and maintains specific state goals. Nat'l Adver. Co. v. Dep't. of Highways, 751 P.2d 632, 635–36 (Colo.1988).

Here, as evidenced by the comprehensive state statutory scheme, the state must place and supervise adjudicated delinquent children in foster care homes in a manner that is uniform and consistent throughout the state to protect the best interests of the juvenile, the juvenile's family, and the community. Indeed, the General Assembly required the formation of a state working group pursuant to section 19–2–212 to assure uniform and consistent commitment and placement criteria at all stages of a disposition to achieve the goals of the Children's Code for adjudicated delinquent children throughout the state. Those goals mandate that the state guarantee that children removed from their homes are assured their new homes will be where they can feel safe and secure, they will not arbitrarily be removed from those homes, and they can, if appropriate, confidently plan for the future. Ordinance 1248 materially impedes these goals by indiscriminately removing state-placed children from their homes. Id. at 636.

Under our uniformity analysis, we have also found uniform access and expectations of consistency important factors to consider in determining whether a matter is of statewide concern. In Century Elec. Serv. & Repair, Inc. v. Stone, 193 Colo. 181, 184, 564 P.2d 953, 955 (1977), we held that the state had an overriding concern in the regulation of electricians because the electricians needed uniform access to markets throughout the state. See also Telluride, 3 P.3d at 38. And in Telluride, we evaluated the state's interest in landlord-tenant relations and found that it was an area in which state residents have an expectation of consistency throughout the state. Id.

There is no less need here for the state to ensure that adjudicated delinquent children have uniform access to state-created foster care families and can rely on consistent procedures and practices designed to rehabilitate them.

Ordinance 1248 denies specific adjudicated delinquent children—registered sex offenders living in a foster care home in Northglenn—the uniform access to the treatment that is best suited for their needs. For juvenile offenders such as the Ibarra foster children, the Ordinance denies them access to a setting that is state-created to reduce the rate of recidivism and to assist them in becoming productive members of society.

Ordinance 1248 also denies adjudicated delinquent children residing in a Northglenn foster care home the expectation of consistency that is provided to them by the Children's Code. All children removed from their homes, even those adjudicated as delinquent, must be able to rely on the procedures and protections guaranteed to them in a comprehensive state statutory scheme. Ordinance 1248 prohibits the Ibarra foster children from living together and thus eliminates any expectations of consistent treatment. By doing so, Ordinance 1248 creates a "patchwork approach" to the placement of certain foster care children, see *Telluride*, 3 P.3d at 39, focusing on factors such as the locality they live in and their status as registered sex offenders. The state is statutorily required to avoid the patchwork approach and provide uniform treatment to adjudicated delinquent children in a manner that protects their best interests.

**2. Extraterritorial Impact on Residents Outside the Municipality**

■ Having discussed the need for statewide uniformity, we now turn to address the related state interest in avoiding the extraterritorial impact of laws such as Ordinance 1248 that limit the number of foster care homes available for adjudicated delinquent children. We have defined "extraterritorial impact" as a ripple effect that impacts state residents outside the municipality. *Telluride*, 3 P.3d at 38–39 (finding that a local ordinance restricting the operation of the free market with respect to housing in one area may well have a ripple effect and cause housing investment and population to migrate to other communities already facing their own growth problems). To find a ripple effect, however, the extraterritorial impact must have serious consequences to residents outside the municipality, and be more than incidental or *de minimus*. *Denver*, 788 P.2d at 769. Ordinance 1248 causes such serious consequences.

By limiting the number of registered adolescent sex offenders who may reside in one foster care home, Ordinance 1248 has a significant adverse effect in and outside Northglenn because it decreases the total number of foster care homes available in a statewide system. Ordinance 1248 requires that unrelated children who are also registered sex offenders be placed in separate homes. As the legislature has declared, there is an increasing difficulty attracting foster care parents for the number of children placed outside of their homes. *See* § 26–5.5–102(1)(c). However, Ordinance 1248 forces two of the three children to seek outside placement in a state system that is already in short supply of foster care homes. In Colorado, there were only 3200 homes for the 13,000 foster care children who spent a portion of the year in a foster care home in 2000. *See* A White Paper on Foster Care in Colorado, Colo. Ass'n. of Family and Children's Agencies, Inc., (Nov.2002), available at http://www.cafca.net/fostercarewhitepaper.htm. The availability of foster care homes is further constrained because the state must place foster care children in homes that are reasonably near their biological parents and schools. *See* 12 C.C.R. 2509–4. As a result, for each foster care child, there are a limited number of foster care homes—usually within the child's county or municipality—that are within proximity of parents and schools. By forcing juvenile sex offenders out of foster care homes, Ordinance 1248 has a ripple effect on the availability of homes for all foster care children, particularly those who require the type of treatment that the Ibarras provided to sexually abused victims and perpetrators. This ripple effect is compounded by the fact that other municipalities

in Colorado have similar ordinances that limit the number of unrelated sex offender foster care children residing in one home.[17]

### 3. History and Tradition

■ Next, we address the factor of history and tradition. Northglenn argues that zoning ordinances regulating land-uses are historically and traditionally matters of local concern. However, when considering whether a subject matter is historically or traditionally regulated by the locality or the state, we have rejected a "categorical approach" and focused instead on "the importance of the facts and circumstances of a particular case." *Commerce City*, 40 P.3d at 1282 (quoting *City and County of Denver v. Pike*, 140 Colo. 17, 23, 342 P.2d 688, 691 (1959)). Northglenn's categorization of Ordinance 1248 as simply a "zoning ordinance" fails to capture the sweep of this ordinance's impact upon state-placed and state-created foster families involving delinquent juvenile sex offenders.

The facts and circumstances of this case show that Ordinance 1248 regulates state-created foster families in a manner that requires the removal of state-placed delinquent children. The regulation of such state-placed delinquent children implicates the Colorado Children's Code and the state's obligations to those children under the Code. The *parens patriae* interests in the welfare of children have always been a matter of state legislation. *In re Custody of C.C.R.S.*, 872 P.2d 1337, 1350 (Colo.App.1993), *aff'd*, 892 P.2d 246 (Colo.1995), *cert. denied*, 516 U.S. 837, 116 S.Ct. 118, 133 L.Ed.2d 69 (1995)("[T]he Children's Code is a comprehensive legislative scheme devised to administer the state's *parens patriae* responsibility to minor children."). The regulation of such children also implicates the provision of social services through the State Department of Human Services. Colorado statutes have historically and traditionally mandated that the state play the primary role in the provision of social services. The state's social service system is a matter of statewide concern.

*Denver*, 788 P.2d at 772 (citing *Evert v. Ouren*, 37 Colo.App. 402, 405, 549 P.2d 791, 794 (1976)); *see also Dempsey*, 649 P.2d at 727 ("That the social services system is a matter of statewide rather than local or municipal concern is apparent."). Ordinance 1248, as applied here, implicates judicial supervision of delinquent children and the provision of social services to those children—matters that are traditionally and historically regulated by the state.

### 4. The Colorado Constitution

■ We next evaluate whether the Colorado Constitution commits the regulation of adjudicated delinquent children residing in foster care homes to either the city or the state. *Telluride*, 3 P.3d at 39. Although the Constitution assigns home-rule powers to Northglenn pursuant to Article XX, Section 6, it does not specifically provide that Northglenn may regulate land-use in such a manner that also regulates the number of adjudicated delinquent children living in foster care homes. Indeed, the legal status of these children flows directly from the judicial powers granted exclusively to state courts under Article VI of the Colorado Constitution. Because the subject matter here implicates both local and state concerns, the Constitution "cannot be read to dictate the matter at issue as one of exclusively local concern." *Commerce City*, 40 P.3d at 1283–84.

### 5. The Degree of Cooperation Needed Between State and Counties To Make the System Work

■ An additional factor in evaluating the interest of the state is the degree of cooperation between the state and the counties that is required to make the system work. *Commerce City*, 40 P.3d at 1281; *see also Denver*, 788 P.2d at 768 (finding that a state concern is more likely where there is a high degree of cooperation necessary between state and county governments).

17. The Ibarras investigated moving to another nearby community to prevent the breakup of their family but neighboring communities had all adopted similar ordinances. Indeed, at least six-

teen counties and municipalities in Colorado have adopted some form of regulation limiting the number of registered sex offenders who may reside in one home.

For children adjudicated delinquent, the state must place them in the most appropriate setting available consistent with the needs of the child and the community. The state can only meet these specific goals and make the social services system work for delinquent children through the coordination with its state designees: the County Departments of Social Services. These state designees must carry out the mandates of the social services system as they pertain to child welfare and ensure consistent and uniform application.

### 6. Legislative Declarations

█ Finally, our analysis of the relative provisions of state statutes persuades us that the General Assembly has implied an intent to preempt the regulation of adjudicated delinquent children living in foster care homes. Under the Colorado Sex Offender Registration Act, the General Assembly dictates that adjudicated delinquent juveniles or juveniles receiving deferred adjudications for unlawful sexual behavior must register. Under the Children's Code, the General Assembly provides the guidelines through which state courts adjudicate children delinquent or defers their adjudication for unlawful sexual behavior. The state has the exclusive authority to make placement decisions for adjudicated delinquent children. The state places these juveniles in foster care homes when the state believes it will be the best environment through which to rehabilitate the juvenile, to integrate him or her back into society, and to reduce recidivism. The state, or its designees, decides which children shall live in a foster care home and for how long. The state guarantees to them the protections and procedures that will serve their best interests. Although the counties and private agencies administer these state functions, they are merely subordinate designees of the state.

State statutes are so pervasive as to the primary role of the state in the lives of juvenile delinquents removed from their homes and placed in foster care that they imply an intent by the General Assembly to occupy the field. *Dempsey,* 649 P.2d at 728.

### 7. The Interest at Stake is a Matter of Statewide Concern

We conclude that the state's interest in fulfilling its statutory mandates to protect adjudicated delinquent children in need of state supervision and appropriate treatment is sufficiently dominant to override a home-rule city's interest in regulating the number of registered juvenile sex offenders who may live in one foster care family. Even though Northglenn has a legitimate interest in regulating land uses under its home-rule powers, such an interest is insufficient to characterize the regulation of delinquent foster care children as even a matter of "mixed" concern and neither the Colorado · Constitution nor state statutes grant Northglenn the authority to regulate this matter. Considering the totality of the circumstances, we hold that Ordinance 1248 is preempted because it regulates a matter of statewide concern: adjudicated delinquent children in state-created foster care families. To hold otherwise, and to uphold Ordinance 1248 as it pertains to these families, would exempt adjudicated delinquent foster care children from the procedures and protections guaranteed to them by Colorado law. *Telluride,* 3 P.3d at 36.

### V. CONCLUSION

For the reasons stated above, we affirm the decision of the district court and remand this case to it with instructions to return the case to the trial court for dismissal.

Justice COATS dissents, and Justice KOURLIS and Justice RICE join in the dissent.

Justice COATS, dissenting:

Because I do not agree that Northglenn's ordinance suffers from the constitutional or statutory shortcomings identified by either the majority opinion or the district court, I respectfully dissent. I am most concerned by the majority's analysis leading it to invalidate application of the ordinance to a particular class of registered sex offenders on the grounds that this particular application affects a matter of exclusively statewide concern. In my view, the majority analysis subtly misapplies our precedent in this area in a

way that radically alters the relationship between home rule cities and the state, by virtually eliminating the area of mixed concern, in which both city and state had previously been permitted to legislate. Because I believe our well-established precedent requires not only that Northglenn's ordinance be considered the regulation of a matter of mixed state and local concern, but also that it be found to be consistent with state law, I would uphold the validity of the ordinance and reverse the district court.

## I.

There appears to be no dispute that the authority of home rule cities to legislate in specific areas, and the determination whether city or state legislation will predominate in the event of conflict, depend upon the nature of the matters being regulated. While the enactments of home rule cities are authorized and predominate over conflicting state statutes in matters of exclusively local concern, home rule cities have no authority to legislate in matters of exclusively statewide concern unless expressly granted by constitution or statute. *City of Commerce City v. State*, 40 P.3d 1273, 1279 (Colo.2002); *Town of Telluride v. Lot Thirty–Four Venture, L.L.C.*, 3 P.3d 30, 37 (Colo.2000). Because local and statewide concerns are not mutually exclusive, we have also found it useful to categorize some matters as being of mixed local and statewide concern. *City and County of Denver v. Qwest Corp.*, 18 P.3d 748, 754 (Colo. 2001); *City and County of Denver v. State*, 788 P.2d 764, 767 (Colo.1990). The majority accepts the well-established proposition that home rule cities may legislate in matters of mixed local and statewide concern as long their enactments are consistent with state law. *See Commerce City*, 40 P.3d at 1279; *Telluride*, 3 P.3d at 37; *Qwest*, 18 P.3d at 754; *Denver*, 788 P.2d at 767. It is the majority's understanding of our precedent governing the categorization of legislative concerns as either statewide, local, or mixed that I do not share.

## A.

We have often noted that the nature of the particular concerns involved in legislation must be determined from the totality of the circumstances, and we have described various considerations pointing to statewide or local concerns. *Telluride*, 3 P.3d at 37. We have also readily acknowledged the legal/policy dimension of these categories and have held that we may characterize a matter "as local to express our conclusion that, in the context of our constitutional scheme, the local regulation must prevail," notwithstanding "a relatively minor state interest in the matter," or the state's suggestion of a "plausible interest" in regulating the matter. *Denver*, 788 P.2d at 767. Nevertheless, the mere fact that the concerns of one or the other government are "considerable" does not preclude categorization of the matter as mixed. *Telluride*, 3 P.3d at 37. Until today, we have never held that significant local and state interests, identified by considering the totality of the circumstances, should be balanced against each other to determine which is the weightier, with the result that the more weighty concern governs categorization. To do so would definitionally limit applicability of the third category of mixed concerns to matters involving *equal* state and local concerns and would abandon our prior holdings allowing both governments to legislate where both have appropriate concerns.

Allowing both governments to legislate with regard to matters of mixed concern is not a compromise for situations in which it cannot be said which concern is greater; it is a recognition that some matters legitimately concern both local and state governments and both must be permitted to legislate, as long as their enactments do not conflict. This is especially appropriate where a city ordinance does not facially interfere with a state regulatory scheme but its operational effect impacts a matter of statewide concern. On its face, Northglenn's ordinance regulates the cohabitation of sex offenders who are unrelated by blood or marriage, not juveniles or foster families, but as a practical matter its enforcement impacts the state's ability to create foster families with multiple registered sex offenders. To the extent that both zoning and public safety are legitimate matters of local concern, and the regulation and protection of juveniles, including the designa-

tion of foster families, are matters of state-wide concern, regulating the number of unrelated sex offenders permitted to live in a single, residential home is a classic example of mixed statewide and local concern. Whether Northglenn's ordinance is a valid exercise of the city's legislative authority should therefore turn on its consistency with state law.

The majority's ultimate conclusion that the ordinance regulates a matter of exclusively statewide rather than mixed concern, despite acknowledging that "both local and state interests are implicated," maj. op. at 160; *see also id.* at 31, is at odds with the very authority upon which it relies. *See, e.g., Commerce City,* 40 P.3d at 1284–85 (categorizing regulation of automated vehicle identification system as matter of mixed concern where analysis showed both cities and state have important interests at stake); *Telluride,* 3 P.3d at 39 (categorizing rent control as matter of mixed concern given legitimacy of both state and city interests); *Nat'l Adver. Co. v. Dep't of Highways,* 751 P.2d 632, 638 (Colo.1988) (categorizing control of outdoor advertising devices within home rule city along roads of state highway system as matter of mixed concern); *cf. Denver,* 788 P.2d at 767, 772 (categorizing residency of municipal employees as matter of local concern because no substantial state interest could be claimed); *Century Elec. Service & Repair, Inc. v. Stone,* 193 Colo. 181, 183, 564 P.2d 953, 954 (1977) (invalidating Denver requirement for licensing of electricians because of conflict with state statute). Most particularly, while the state's enactments and its intent to occupy an entire field of regulatory law may create a conflict, and in that way preempt local legislation, the General Assembly cannot make a matter of local concern any less so by imposing its own regulatory scheme, even where it has legitimate statewide concerns. *See Bd. of County Comm'rs v. Bainbridge, Inc.* 929 P.2d 691, 710–11 (Colo.1996) (noting that preemption applies when statutory language expresses intent to prohibit exercise of local government authority in matters of shared state and local interest or may be inferred if the state statute impliedly evinces a legislative intent to completely occupy a given field by reason of a dominant state interest); *see also Dempsey v. City and County of Denver,* 649 P.2d 726, 727 (Colo.App.1982),(finding "conflict" with ordinance limiting social service employee salaries where state social services system evinced intent to preempt entire field). By contrast with the conclusion actually reached by the majority, I believe that its own analysis leads inexorably to the conclusion that Northglenn's ordinance regulates a matter of mixed concern, and much of the majority's analysis, in my view, actually addresses the question whether the ordinance and state statutes are consistent and may coexist rather than disputing the mixed nature of the concerns involved.

**B.**

We have indicated that in matters of mixed local and statewide concern, ordinances and state statutes may coexist as long as they are harmonious, *see Telluride,* 3 P.3d at 37, consistent, *see Qwest,* 18 P.3d at 754, or not in conflict, *see National Adver.,* 751 P.2d at 638. We have also said, that a conflict between state and local legislation exists when a local ordinance authorizes what state legislation forbids, or forbids what state legislation authorizes. *E.g., Denver & Rio Grande W. R.R. Co. v. City and County of Denver,* 673 P.2d 354, 361 n. 11 (Colo.1983); *Ray v. City & County of Denver,* 109 Colo. 74, 121 P.2d 886 (1942). With regard to preemption generally, we have delineated three basic ways in which an ordinance or regulation can be preempted by state statute. An ordinance will be considered completely preempted by express statutory language preempting all local authority over the subject matter or by an implicit legislative intent to completely occupy a given field by reason of a dominant state interest, and an ordinance may be partially preempted where its operational effect would conflict with the application of the state statute. *Bd. of County Comm'rs v. Bowen/Edwards Assoc., Inc.,* 830 P.2d 1045, 1056–57 (Colo.1992).

There appears to be no suggestion by the parties (or the majority opinion) that state statutes contain any provision expressly preempting, or for that matter expressly conflicting with, Northglenn's ordinance. As an

element of its analysis finding this to be a matter of exclusively statewide concern, however, the majority finds an implied intent of the General Assembly to occupy the entire field, which it describes as "the regulation of adjudicated delinquent children living in foster care homes." maj. op. at 162–163. Both the majority's extreme narrowing of the "field" of concern and its invalidation of the ordinance only to the extent that it impacts "adjudicated delinquent children in foster care homes," maj. op. at 156, seem more analytically consistent with disapproval of a particular operational effect of the ordinance than finding a legislative intent to occupy an entire field of regulation. Furthermore, if taken at face value, the majority's conclusion that Northglenn's ordinance regulates an area implicitly preempted by the General Assembly would seemingly end the matter, rendering superfluous its analysis of statewide concern. In fact, however, the ordinance does not attempt to compete or interfere in any way with state regulation of adjudicated delinquent children living in foster care homes. It limits the number of unrelated sex offenders who may live in one residential dwelling and, for that reason and that reason alone, operationally affects the ability of state agents to place some children—those who have been adjudicated as sex offenders—in foster care homes that already include one registered sex offender.

We have previously made clear that the Children's Code does not prohibit the prosecution of juveniles for violating municipal ordinances where the municipal ordinance scheme does not "authorize what the Children's Code forbids, or forbid what the Children's Code expressly authorizes." *R.E.N. v. City of Colorado Springs*, 823 P.2d 1359, 1362 (Colo.1992); *see also Wigent v. Shinsato*, 43 Colo.App. 83, 601 P.2d 653 (1979), (finding jurisdiction in both juvenile and municipal courts for shoplifting); *cf. City and County of Denver v. Dist. Court*, 675 P.2d 312, 314 (Colo.1984). Northglenn's ordinance clearly does not authorize something that the Children's Code, or any other statute, forbids. Neither does it forbid what the Children's Code expressly authorizes. In fact, it can be said to forbid what state statutes authorize only in the sense that the General Assembly has delegated to agents of the Department of Social Services or licensed child placement agencies, within the limits allowed by department regulations, the authority to place children in the department's custody in foster homes. Nowhere has it been suggested that state statutes, or even Social Service regulations, expressly treat the question of multiple registered sex offenders in a single residential dwelling or establish criteria for placement with which the ordinance directly conflicts.

Rather than find that a general grant of discretion to a state agent preempts otherwise valid enactments of home rule cities whenever they, in some way or under some set of circumstances, limit the exercise of that discretion, I think it more reasonable to hold that a general grant of discretion is implicitly limited by otherwise valid law—whether that law is local or statewide. Any other conclusion would be intolerable. Surely it would be unacceptable in the absence of an express delegation of authority to permit even an authorized child placement agency to place a child in violation of health or building code requirements or in areas zoned for other than residential dwellings. In the absence of either an express delegation to do so or a showing of necessity in the fulfillment of a statutory mandate, I consider it unjustified to presume a legislative intent to permit the violation of local law by state agents.

Nothing in our jurisprudence governing legislation in matters of mixed local and statewide concerns unduly limits the General Assembly in overseeing statewide interests. If ordinances like Northglenn's actually have deleterious effects on the placement of registered juvenile sex offenders, the state legislature is in the best position to examine the various local and statewide concerns, evaluate the relevant policy considerations, and if merited, preempt local action. Local action in the interest of public safety, however, should not in my opinion be preempted by the unguided choice of a state agent in a particular case.

II.

Because I do not believe Northglenn lacked the power to legislate as it did or that

its ordinance is preempted by inconsistent state statutes, I would reach the grounds relied upon by the district court and reject both of them.

In short, I think it clear that the district court confused the question whether Ibarra had a liberty interest in the maintenance of her foster family for purposes of procedural due process, with the question whether that interest (if it existed) amounted to a fundamental right for purposes of substantive due process. *See Smith v. Org. of Foster Families for Equal. & Reform,* 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (finding no protected liberty interest by foster parents entitling them to procedural due process at all where the possibility of reunification exists); *see also People in the Interest of A.W.R.,* 17 P.3d 192 (Colo.App.2000),(holding that no expectation of continued foster placement can arise until goal of reunification has been abandoned). A statutorily created "foster family," which is subject to dissolution at the discretion of the Department of Social Services, clearly cannot rise to the level of a fundamental constitutional right, the deprivation of which would require strict scrutiny by the courts and justification by a compelling state interest, and the city's declaration of public safety concerns clearly amount to a rational basis for its legislation.

Similarly, the district court's finding that the ordinance violated the Fair Housing Act, 42 U.S.C. § 3601, by denying housing "because of ... familial status" lacks any support whatsoever. Facially, the ordinance does not discriminate on the basis of familial status but rather on the basis of registration as a sex offender, and there is no allegation, much less any attempt to prove, that despite being neutral on its face, the ordinance was directed against or had a disproportionately discriminatory effect upon families. *Cf. Village of Arlington Heights v. Metro. Housing Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (facially neutral zoning ordinance did not violate equal protection in absence of showing that it was motivated by intent to discriminate on basis of race).

## III.

Because the ordinance is supported by legitimate local concerns, does not violate constitutional guarantees of substantive due process of law, and conflicts with neither federal nor state law, I would reverse the judgment of the district court. Because the state also has a legitimate concern for the placement of delinquent children that is potentially impacted by the ordinance, the General Assembly may act to preempt that effect of the ordinance if it finds that action to be appropriate.

I therefore respectfully dissent.

I am authorized to say that Justice KOURLIS and Justice RICE join in this dissent.