The Supreme Court of the State of Colorado 
2 East 14th Avenue • Denver, Colorado 80203

2016 CO 8

Supreme Court Case No. 14SA84
Certification of Question of Law
United States Court of Appeals for the Tenth Circuit, Case No. 13-1369

Plaintiff-Appellee: 
Stephen Brett Ryals,
v.
Defendant-Appellant: 
City of Englewood.

Certified Question Answered 
en banc
January 25, 2016

Attorneys for Plaintiff-Appellee:
FAEGRE BAKER DANIELS LLP
Daniel D. Williams
Jennifer L. Sullivan
Hetal J. Doshi
Boulder, Colorado
ACLU Foundation of Colorado
Mark Silverstein
Sara Rich
Denver, Colorado
Attorneys for Defendant-Appellant:
Senter Goldfarb & Rice, L.L.C.
Thomas S. Rice
Monica N. Kovaci
Denver, Colorado
Attorney for Amicus Curiae Colorado Municipal League: 
Colorado Municipal League
Rachel L. Allen 
Denver, Colorado
JUSTICE EID delivered the Opinion of the Court.
JUSTICE HOOD concurs in part and dissents in part, and JUSTICE GABRIEL joins in the concurrence in part and dissent in part.
 
¶1         We accepted jurisdiction over this certified question of law from the United States Court of Appeals for the Tenth Circuit. See C.A.R. 21.1. The Tenth Circuit has asked us whether the City of Englewood’s Ordinance 34, which effectively bars certain sex offenders from residing within the city, is preempted by Colorado law. 560 F. App’x 726 (10th Cir. 2014) (unpublished order). As a preliminary matter, we conclude that because both state and local governments have an interest in governing the matter of sex offender residency, the ordinance concerns an issue of mixed state and local concern. As such, it may stand as long as it does not conflict with state law on the subject. Webb v. City of Black Hawk, 2013 CO 9, ¶ 16, 295 P.3d 480, 486. The federal district court in this case concluded that such a conflict did exist because Colorado has generally opted for a policy of individualized treatment of sex offenders, and the Englewood ordinance acts as an effective bar to residency. Ryals v. City of Englewood, 962 F. Supp. 2d 1236, 1249–51 (D. Colo. 2013). We disagree with the federal district court and find no conflict. There is no state law that requires individual consideration with regard to the residency of sex offenders, and in fact state law and the ordinance may both be given full effect. Because we conclude that no conflict exists between state law and the ordinance, Ordinance 34 is not preempted by state law. We therefore answer the certified question in the negative and return this case to the Tenth Circuit for further proceedings.
I.
¶2         In 2001, Stephen Brett Ryals had a sexual relationship with a sixteen-year-old girl he coached on a high school soccer team. He pled guilty to criminal attempt to commit sexual assault on a child by one in a position of trust and was sentenced to seven years of probation. After violating his probation by continuing to see the victim, he was sentenced to two years in prison. He was released in April of 2003. Under the Colorado Sex Offender Registration Act (“CSORA”), §§ 16-22-101 to -115, C.R.S. (2015), he was required to register as a sex offender for a decade after his release. § 16-22-103(1)(a). He is under no other state supervision.
¶3         In July of 2006, the Colorado Parole Board informed the City of Englewood, a home-rule municipality, that it planned to place a sexually violent predator at an extended-stay hotel that was within a block of a daycare facility. Originally, the placement was planned in Greenwood Village, but Greenwood Village passed a local ordinance that essentially banned sex offenders from residing in the city. In response, Englewood passed its own emergency ordinance in September 2006 that operated in the same way, effectively barring sex offenders from residing in the city.
¶4         The ordinance applies generally in two instances. First, it applies to sexually violent predators as defined by section 18-3-414.5, C.R.S. (2015). Second, it applies to those sex offenders who, like Ryals, are required to register under CSORA because they have either been “[c]onvicted of a felony for an offense requiring registration,” have “multiple convictions for offenses requiring registration,” or their “offense(s) requiring registration involved multiple victims.” EMC 7-3-3(A)(ii)a–b.
¶5         The ordinance makes it unlawful for people in either group to “establish a permanent residence or temporary residence within two thousand feet (2,000’) of any school, park, or playground or within one thousand feet (1,000’) of any licensed day care center, recreation center or swimming pool (other than pools located at private, single-family residences).” EMC 7-3-3(A). According to estimates, these restrictions make 99% of the city off limits to qualifying sex offenders. Ryals, 962 F. Supp. at 1241.
¶6         The stated intent of the ordinance is “to serve the City’s compelling interest to promote, protect and improve the public health, safety and welfare by creating areas, around locations where children regularly congregate in concentrated numbers, where sexual predators and specified sexual offenders are prohibited from establishing temporary or permanent residence.” EMC 7-3-1.
¶7         In 2012, Ryals purchased a home in Englewood. After buying the home, he called the local police to ask about the process of registering as a sex offender. An officer told him that, because he was a qualifying sex offender under Englewood’s Ordinance 34, he was not allowed to live within the city limits. Nevertheless, Ryals went to the Englewood police station the next day to attempt to register. He was issued a citation for violating the ordinance.
¶8         He then sued Englewood in the U.S. District Court for the District of Colorado, asserting, among other claims, that Ordinance 34 is preempted by Colorado’s sex offender regulations. The criminal proceeding against him stemming from the citation was stayed while he challenged the validity of the ordinance.
¶9         The federal district court held that the ordinance was preempted by Colorado state law. First, the court concluded that the ordinance addressed a matter of mixed state and local concern because it implicated both local and state interests. Ryals, 962 F. Supp. 2d at 1249 (finding that the city has a valid interest in regulating land use and protecting its citizens but that the ordinance implicated “substantial state interests,” including “the consistent application of statewide laws to fulfill the goal of managing and supervising sex offenders”). It then concluded that, in its operation, Ordinance 34 conflicted with the state’s comprehensive regime for regulating sex offenders and therefore was preempted by state law. Id. It reasoned that the state had adopted an individualized approach to sex offender treatment, and that the ordinance conflicted with such an individualized approach because it did not, on an offender-by-offender basis, consider “the nature of the offense, the treatment the offender has received, the risk that he or she will reoffend against children, and the evaluation and recommendations of qualified state officials” when determining whether a sex offender could reside within the city. Id. at 1251.
¶10         Englewood appealed the ruling to the Tenth Circuit. The circuit court determined that “every step of [the issue’s] resolution is firmly within the province of Colorado law” and certified the question to this Court under Tenth Circuit Rule 27.1 and C.A.R. 21.1. 560 F. App’x at *729.
II.
¶11         To determine if state law preempts a home-rule city’s ordinance, we engage in a two-step analysis. See Webb, ¶¶ 16, 43, 295 P.3d at 486, 492. First, we ask whether the issue the ordinance regulates is one of local, statewide, or mixed local and statewide concern. Id. at ¶ 16, 295 P.3d at 486. If we conclude that the issue is of mixed concern, as we do here, we then ask whether the ordinance conflicts with state law on that issue. Id.at ¶ 43, 295 P.3d at 492. We conclude that Ordinance 34 does not conflict with any provision of state law. Therefore, it is not preempted.
A.
¶12         Colorado’s preemption doctrine begins with Article XX, section 6 of the Colorado Constitution, which grants municipalities “home rule” authority to govern “local and municipal matters.” Colo. Const. art XX, § 6. In order to determine the boundaries of state authority vis-à-vis the authority of a home-rule municipality, we have developed three categories into which a specific issue may fall: (1) matters of local concern, (2) matters of statewide concern, and (3) mixed matters of state and local concern. Webb, ¶ 18, 295 P.3d at 486. Both the home-rule city and the state may legislate with regard to matters of local concern, but in the event of a conflict, the home-rule provision prevails over the state provision. Id. In matters of statewide concern, the state legislature has plenary authority, and the home-rule city has no power to act unless the constitution or a state statute specifically affords it such power. Id. For matters of mixed state and local concern, both the home-rule city and the state may regulate, so long as the regulations do not conflict. Id. In the event of a conflict, the state law preempts and supersedes the local provision. Id. Consequently, to determine whether state law preempts a local law under Article XX, section 6, we must first ask whether the regulated matter is one of local, state, or mixed local and state concern. We have held that such a determination is a legal question. Id. at ¶ 19, 295 P.3d at 486.
¶13         We make this determination on a case-by-case basis, considering the relative interests of the state and the municipality in regulating the matter. Id. Although we may consider any factors we deem relevant, we have consistently consulted four factors in making this determination: (1) the need for statewide uniformity; (2) the extraterritorial impact of the regulation at issue; (3) whether the matter has traditionally been regulated at the state or local level; and (4) whether the Colorado Constitution commits the matter to state or local regulation. Id. As a practical matter, it is rare for a matter to “fit neatly within one of th[e] three categories.” Id. Before considering the four factors, we briefly describe the state’s sex offender regulations.
B.
¶14         Colorado’s sex offender scheme has three main features relevant to our analysis: management of sex offenders by the Sex Offender Management Board (“SOMB”), sex offender registration under CSORA, and parole board supervision of offenders on supervised release or subject to the Colorado Sex Offender Lifetime Supervision Act of 1998 (“SOLSA”).
¶15         In 1992, the Colorado General Assembly created the SOMB “to protect the public and to work toward the elimination of sexual offenses.” § 16-11.7-101(1), C.R.S. (2015). It tasked the SOMB to “comprehensively evaluate, identify, treat, manage, and monitor adult sex offenders who are subject to the supervision of the criminal justice system” by establishing “evidence-based standards for the evaluation, identification, treatment, management, and monitoring of adult sex offenders.” §§ 16-11.7-101(1), (2).
¶16         One of the SOMB’s duties is to determine the “best practices for living arrangements for and the location of adult sex offenders within the community.” § 16-11.7-103(4)(g), C.R.S. (2015). Another is to “develop, implement, and revise, as appropriate, guidelines and standards to treat adult sex offenders.” § 16-11.7-103(4)(b). The SOMB does this by publishing its “Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders.” Only one of these guidelines directly pertains to sex offender residency, providing that, when a sex offender seeks to change residences, “any change of residence must receive prior approval by the supervising officer.” Standards and Guidelines § 5.620(K) (2011).
¶17         At the request of the General Assembly, the SOMB drafted a paper called “Report on Safety Issues Raised by Living Arrangements for and Location of Sex Offenders in the Community.” In the report, the SOMB examined residency restrictions such as the one in Englewood, found that they are counterproductive to public safety, and recommended against them. While this report is “vital to inform the decisions” of the General Assembly, § 16-11.7-109, C.R.S. (2015), it is not itself binding law, and the General Assembly has taken no legislative action in response to it. On the contrary, the legislature rejected a 2006 attempt to adopt a statewide residency standard.
¶18         The second chief feature of Colorado’s sex offender regulatory regime, CSORA, requires adults convicted of certain sex crimes to register with local law enforcement in the jurisdiction where they live. § 16-22-108(1)(a)(I), C.R.S. (2015); see also § 16-22-103. Local law enforcement is responsible for approving and verifying registrants’ addresses. § 16-22-109(3.5)(a).
¶19         In deciding whether to accept an offender’s registration, law enforcement officials may account for local residence ordinances under CSORA. Specifically, the statute provides that a “law enforcement agency is not required to accept [a] person’s registration if it includes a residence . . . that would violate state law or local ordinance.” § 16-22-108(1)(a)(I).
¶20         The regulatory scheme’s final feature, SOLSA, regulates the state’s supervision of sex offenders in conjunction with the parole process. See § 18-1.3-1005, C.R.S. (2015). The only provision from this statute that deals with sex offender residency provides that “the division of adult parole shall provide parole supervision and assistance in securing employment, housing, and such other services as may effect [sic] the successful reintegration of such offender into the community while recognizing the need for public safety.” § 17-22.5-403, C.R.S. (2015). In practice, this means that, when a sex offender relocates, he or she is responsible for finding the residence, and the officer approves it. We now turn to the factors.
C.
1.
¶21         First, we address the need for uniformity in the area of sex offender regulation. Although “uniformity in and of itself is not a virtue . . . in the appropriate case the need for uniformity in the operation of the law may be a sufficient basis for [state] legislative preemption.” City of Commerce City v. State, 40 P.3d 1273, 1280 (Colo. 2002) (alteration in original) (citations omitted). A need for uniformity exists “when it achieves and maintains specific state goals.” City of Northglenn v. Ibarra, 62 P.3d 151, 160 (Colo. 2003).
¶22         The strongest indication of a need for uniformity in the area of sex offender residency derives from the legislature’s creation of the SOMB. The General Assembly has determined that, “to protect the public and to work toward the elimination of sexual offenses, it is necessary to comprehensively evaluate, identify, treat, manage, and monitor adult sex offenders.” § 16-11.7-101(1) (emphasis added). It has also acknowledged a need to create and enforce “evidence-based standards for the evaluation, identification, treatment, management, and monitoring of adult sex offenders.” § 16-11.7-101(2). To these ends, it created the SOMB to promulgate statewide standards for sex offender management. See § 16-11.7-103(4). In Ibarra, 62 P.3d at 160, we concluded that the need for uniformity was strong in the context of juvenile sex offenders who were also adjudicated delinquent and placed in foster care homes. While nothing in the statute explicitly states that regulations regarding adult sex offender residency must be uniform, the state’s interest in ensuring that such offenders “can rely on consistent procedures and practices designed to rehabilitate them” mirrors the state interest in Ibarra. Id. at 161.
¶23         Furthermore, the statute instructs the SOMB to “research, analyze, and make recommendations that reflect best practices for [adult sex offenders’] living arrangements.” § 16-11.7-103(g) (emphasis added). It must also “adopt and revise as appropriate such guidelines as it may deem appropriate regarding the living arrangements and location of adult sex offenders,” presumably consistent with these “best practices.” Id. The legislature’s command that the SOMB identify and issue regulations that reflect the “best practices” with respect to living arrangements suggests a need for uniformity in this more specific aspect of sex offender management.
¶24         Aside from this provision regarding “best practices,” however, Colorado law does not explicitly address the more specific issue of residency. While the SOMB’s position paper argues against residency restrictions, that paper is merely advisory in nature. See § 16-11.7-109 (stating that the SOMB’s “research and analysis of treatment standards and programs . . . is vital to inform the decisions” of the General Assembly). It is not itself binding law, and the General Assembly has taken no legislative action in response to it. Moreover, the only “best practice” the SOMB has promulgated pursuant to section 16-11.7-103(g) simply requires officer approval of a new residence before an offender moves in. See Standards and Guidelines § 5.620(K).
¶25         Significantly, state law envisions at least some role for local governments in the regulation of sex offender residency. CSORA specifically provides that local law enforcement officers need not approve an offender’s registration “if it includes a residence or location that would violate state law or local ordinance.” § 16-22-108(1)(a)(I) (emphasis added). This language suggests that although there is a need for uniformity in the more general area of sex offender management, there is room for difference in the narrower area of residency regulation.
2.
¶26         The second factor is “the impact of municipal regulation on persons living outside the municipal limits.” Commerce City, 40 P.3d at 1280. Concerns involving such extraterritorial impacts necessarily implicate “the expectations of state . . . residents” in other localities. Fraternal Order of Police, Colorado Lodge No. 27 v. City & Cty. of Denver, 926 P.2d 582, 590 (Colo. 1996). For an ordinance to create an extraterritorial impact, it “must have serious consequences to residents outside the municipality, and be more than incidental or de minimus.” Ibarra, 62 P.3d at 161. In Ibarra, for instance, we found that an ordinance limiting the number of juvenile sex offenders who could reside in a single foster home created an extraterritorial impact because it decreased the number of homes available in the strained statewide system. Id.
¶27         Here, the ordinance could produce impacts beyond Englewood’s borders. First, just as the ordinance in Ibarra would reduce the number of homes available for juvenile sex offenders, so too would Ordinance 34 limit the number of cities available for adults. Relatedly, the ordinance forces sex offenders who would prefer to live in Englewood to live elsewhere, thereby increasing the number of sex offenders in other municipalities.
¶28         Finally, restrictions such as Englewood’s could potentially create a “domino effect,” where other cities set up similar restrictions to prevent would-be Englewood residents from relocating to them. This is precisely why Englewood passed Ordinance 34 in the first place—as a response to the passage of a similar restriction in Greenwood Village. In the past, we have found that such “domino effects” indicate that a matter is of statewide or mixed concern. See Webb, ¶ 37, 295 P.3d at 491 (noting that Black Hawk’s ban on bicycles could “lead to other municipal bicycle bans by local communities which, like Black Hawk, would like to favor large transportation coaches over bicycles”).
¶29         It is important, however, not to overstate this concern over the “domino effect” with regard to ordinances similar to the one at issue here. Restrictions like Englewood’s have been in effect for years, yet the state has not seen a dramatic influx in them that would threaten to preclude sex offenders from residing in Colorado. Instead, the record indicates that only six cities have implemented such restrictions. Ryals, 962 F. Supp. 2d at 1247 n.6 (listing five cities in addition to Englewood that have adopted similar ordinances).
3.
¶30         With respect to the third factor, we ask whether sex offender residency is a matter which has traditionally been regulated by the state or by the home-rule city. In making this determination, the court has rejected a “categorical approach” and has instead “focused on the importance of the facts and circumstances of the particular case to determine the status of the matter at issue, including the time, technology, and economics.” Webb, ¶ 38, 295 P.3d at 491 (citations omitted).
¶31         Here, this factor cuts in both directions. On the one hand, over the past two decades, the state has regulated many aspects of sex offender management through organizations like the SOMB. At the same time, however, Ordinance 34 is a zoning ordinance that regulates land use, an area traditionally of local concern. While this is a compelling consideration in favor of the city, it does not require us to find that residency is a local matter. See Ibarra, 62 P.3d at 162 (rejecting “categorical” classifications of land-use ordinances as primarily local in nature).
4.
¶32         The final enumerated factor is whether the Colorado Constitution commits the regulation of sex offender residency to either the state or local governments. Here, this factor does not clearly favor one side over the other.
¶33         Ryals argues that, because the legal status of sex offenders flows from the state judiciary, the issue of their placement is a state issue. In Ibarra, we made a similar observation, noting that “the legal status of [juvenile sex offenders] flows directly from the judicial powers granted exclusively to state courts under Article VI of the Colorado Constitution.” Id. Ryals’s argument is not persuasive in this context, however. In Ibarra, both the judiciary and the state played an active role in the placement of delinquent children. Id. at 157. Here, by contrast, any judicial role is too attenuated to make the Article VI argument made in Ibarra. Moreover, there is no state statute to provide specific guidance on residency for sex offenders in this situation.
¶34         Englewood’s argument is equally unavailing. It argues that the Colorado Constitution assigns its power to regulate in this area based on the home-rule amendment. This argument, however, reads the home-rule amendment too broadly, as a city’s mere power to regulate “does not necessarily mean that the [regulated] matter is a strictly local issue.” Commerce City, 40 P.3d at 1284.
¶35         As such, we find that the Colorado Constitution specifically commits the issue of sex offender residency to neither the state nor local government.
5.
¶36         Besides the four factors we have traditionally consulted, two additional factors are relevant to this case. The first is the degree of cooperation required between state and local governments for state sex offender regulations. Ibarra, 62 P.3d at 162–63. The more cooperation required between the two entities, the more likely we are to find the matter to be of statewide or mixed concern. Id. at 162 (citing City & Cty. of Denver v. State, 788 P.2d 764, 767 (Colo. 1990)). In Ibarra, we found that the placement of juveniles in foster care homes required significant cooperation because the state was required to work with local social services offices to “place them in the most appropriate setting available consistent with the needs of the child and the community.” Id. at 163.
¶37         Here, the placement of sex offenders requires similar cooperation between state and local governments, as local law enforcement is charged with registering sex offenders and approving their residencies. § 16-22-108(1)(a)(I). As local officials may decline to accept registrations that violate local law, id., however, the degree of local cooperation required is not as stringent as it was in Ibarra.
¶38         The final factor is legislative declarations on the issue. See Webb, ¶ 19, 295 P.3d at 486 (“Although not conclusive in itself, a determination by the General Assembly that a matter is of statewide concern is relevant.”). Here, the state, in its creation of the SOMB, has emphasized that “it is necessary [for public safety] to comprehensively evaluate, identify, treat, manage, and monitor adult sex offenders.” § 16-11.7-101(1) (emphasis added). While this does not amount to an explicit statement that sex offender residency is a matter of statewide concern, it does indicate that the broader area encompassing this specific issue—the management of sex offenders—is of such concern.
* * *
¶39         As in most cases, the issue of sex offender residency is not given to easy categorization. Most prominent among the state’s interests are its interests in the uniform application of sex offender laws in general and in preventing the potentially significant extraterritorial impacts the Englewood ordinance may produce. At the same time, Englewood has interests in protecting its community and in controlling local land use, an area traditionally left to local governments. Furthermore, the statute specifically contemplates deferring to local governments in some contexts. Importantly, the history of sex offender regulation and the degree of cooperation required between state and local government in this area suggest that both sides have a stake in the matter of sex offender residency.
¶40         We thus conclude that the issue of sex offender residency implicates both state and local interests. Consequently, we agree with the federal district court that this is an issue of mixed state and local concern.
D.
¶41         Having found that sex offender residency is a mixed matter, we next ask whether Ordinance 34 conflicts with state law. Webb, ¶ 43, 295 P.3d at 492. To address this issue, we have asked “whether the home-rule city’s ordinance authorizes what [a] state statute forbids, or forbids what [a] state statute authorizes.” Id. 
¶42         Turning to Ordinance 34, we find no conflict with state law. There is nothing in Colorado’s sex offender regulatory regime that prevents home-rule cities from banning sex offenders from residing within city limits, nor is there anything that suggests that sex offenders are permitted to live anywhere they wish. Significantly, there is only one state provision that explicitly concerns sex offender residency, and that provision only requires state officers to approve sex offenders’ new residences. Standards and Guidelines § 5.620(K). Nothing in this provision suggests that a city cannot ban sex offenders from residing within its borders. State approval of a sex offender’s application does not imply that a city must also approve it. On the contrary, state approval is but one prerequisite to relocating. Once an offender obtains this approval, he or she still must register with local law enforcement, which may decline the registration if the new residence violates local law. See § 16-22-108(1)(a)(I) (stating that a “law enforcement agency is not required to accept [a] person’s registration if it includes a residence . . . that would violate state law or local ordinance”) (emphasis added). Thus, state law on the subject of sex offender registry recognizes that local ordinances play an important role in determining residency.
¶43         Ryals argues that state law “authorizes” him to live wherever he chooses within the state because no state statute deals with sex offender residency. This argument is unpersuasive. “Authorization” requires more than legislative silence on an issue. The failure or refusal to prohibit an action does not amount to “authorization” of that action. See Vela v. People, 484 P.2d 1204, 1206 (Colo. 1971) (concluding that a state statute that failed to include the use of profane language in public as a form of disturbing the peace did not authorize citizens to use profane language in public). If legislative silence amounted to authorization, then it would be virtually impossible for local governments to restrict anything. Ryals’s argument thus goes too far. Furthermore, in this case, we have no reason to read legislative silence as implied authorization for sex offenders to live wherever they please. Indeed, the SOMB submitted a report to the General Assembly criticizing ordinances like Englewood’s, and the legislature took no action in response to it.
¶44         For its part, the federal district court found a conflict by reading requirements into the statutory scheme that are simply not there. Citing sections 16-11.7-101, 16-11.7-109(1)(a), and 16-11.7-103(4)(g), the district court concluded that “the Colorado General Assembly has made clear its desire to promulgate a comprehensive system for regulating sex offenders that is based on individualized, evidence-based assessments.” Ryals, 962 F. Supp. 2d at 1249. In effect, the court inferred that, because the statutory scheme generally favors individualized assessments with regard to treatment, any local law lacking such individualized assessments conflicts with state law. But nothing in the provisions cited by the district court suggests that a home-rule city must individually assess each sex offender seeking to reside within the city. Again, as noted above, the statute specifically provides that local officers are “not required to accept [a sex offender’s] registration if it includes a residence . . . that would violate . . . [a] local ordinance.” § 16-22-108(1)(a)(I). Moreover, this provision contains no qualification on the types of local ordinances to be given effect and certainly does not suggest that local ordinances are effective only if they adopt an individualized assessment of a sex offender’s possible residency. Contrary to the district court’s conclusion, then, the fact that the state scheme favors individual assessments in general does not mean that a local law that lacks them conflicts with state law.
¶45         The district court also found it significant that, unlike Ordinance 34, some state provisions require officials to consider whether “the offender is appropriate for release from supervision and reintegration into the community.” Ryals, 962 F. Supp. 2d at 1250 (citing §§ 17-22.5-403(6), -403(8); § 18-1.3-1001, C.R.S. (2015)). For the district court, Englewood’s ordinance “pose[s] a potentially substantial obstruction to . . . reintegration goals” embodied in these provisions. Id. at 1251 (emphasis added). Similarly, the court concluded that “[t]he blacking out of entire cities to the placement of sex offenders . . . potentially creates a substantial burden on state probation and parole officers” charged with placement of offenders. Id. (emphasis added). In short, the court found that a potential conflict was sufficient for the state scheme to preempt the ordinance. But our test for conflict does not suggest that any potential for conflict must be deemed a conflict. State law and home-rule ordinances conflict where they “cannot coexist” and are “irreconcilable.” Ray v. City & Cty. of Denver, 121 P.2d 886, 888 (Colo. 1942). This is not the case with regard to Ordinance 34; therefore, there is no conflict.
* * *
¶46         Ultimately, we conclude that although sex offender residency is a matter of mixed state and local concern, there is no conflict between state law and Englewood’s Ordinance 34. Accordingly, the ordinance is not preempted by state law.
III.
¶47         Because we conclude that Ordinance 34 is not preempted by state law, we answer the certified question from the Tenth Circuit in the negative. We return this case to that court for further proceedings.
JUSTICE HOOD concurs in part and dissents in part, and JUSTICE GABRIEL joins in the concurrence in part and dissent in part.

 
JUSTICE HOOD, concurring in part and dissenting in part.
¶48         I agree with the majority that this case presents an issue of mixed state and local concern and therefore concur in that aspect of the majority opinion. I disagree, however, with the majority’s analysis of and conclusion concerning preemption. Like the federal district court, I would decide this case under the rubric of operational conflict. Because the effect of local laws like Ordinance 34—banning all sex offenders from residing in entire home-rule cities—would materially impede the state’s comprehensive regulatory scheme for sex offenders, and because section 16-22-108(1)(a)(I), C.R.S. (2015), does not sanction such laws, I would hold that Ordinance 34 is preempted due to operational conflict and would answer the certified question in the affirmative. I therefore respectfully dissent from Part II.D of the majority opinion.
I. Preemption by Operational Conflict
¶49         We have recognized three forms of preemption in the context of assessing local law in relation to state law: express preemption, implied preemption, and “operational preemption,” see Colo. Mining Ass’n v. Bd. of Cty. Comm’rs, 199 P.3d 718, 724 (Colo. 2009), or “operational conflict,” Bd. of Cty. Comm’rs v. Bowen/Edwards Assocs., 830 P.2d 1045, 1059 (Colo. 1992). “Operational conflict” is a term we use to describe the situation in which state law preempts local law because the local law’s “operational effect would conflict with the application of the state [law].” Id. at 1056–57. Over time, we have inconsistently described the standard for identifying operational conflict; indeed, our prior preemption cases could be read as espousing multiple standards. 
¶50         In my view, operational conflict exists where “the effectuation of a local interest would materially impede or destroy the state interest.” Id. at 1059. Since destruction could not occur without material impediment, the crucial inquiry is whether effectuating the local interest would materially impede the state interest. This material impediment standard is broad enough to encompass all of the situations in which we have recognized that conflict can arise, including where “the home-rule city’s ordinance authorizes what state statute forbids, or forbids what state statute authorizes.” Webb v.  City of Black Hawk, 2013 CO 9, ¶ 43, 295 P.3d 480, 492; see also maj. op. ¶ 41. In this sense, then, the majority’s analytical framework is consistent with our operational conflict preemption precedent.
¶51         Still, I cannot endorse the majority’s application of that framework in this case. First, while I agree that legislative silence does not equal authorization, see maj. op. ¶ 43, I reject the notion that the absence of statutory language explicitly sanctioning a specific action amounts to “silence” as to that action. While comparing the language of a local law with that of state laws can expose the existence of conflict, such a comparison cannot, standing alone, prove an absence of conflict. Rather, in order to rule out preemption by operational conflict, we must consider how the laws will work in operation—i.e., how the “operational effect” of a local law might undermine a state statutory scheme. Bowen/Edwards, 830 P.2d at 1057 (emphasis added).
¶52         Second, the majority is wrong to spurn the idea that “a potential conflict [is] sufficient for [a] state scheme to preempt [an] ordinance.” See maj. op. ¶ 45 (emphasis in original). Our preemption doctrine focuses on the validity of the local law at issue, asking whether the law is, or is not, preempted. A law cannot be preempted as to some challengers but not others; we do not wait for it to be preempted “as applied.” Thus, in assessing preemption by operational conflict, we examine whether a local law’s “operational effect would conflict” with a state statutory scheme. Bowen/Edwards, 830 P.2d at 1057 (emphasis added). We search for crossroads “where the effectuation of a local interest would materially impede or destroy the state interest.” Id. at 1059 (emphasis added). We recognize that, while the law’s effect must be discernible, the conflict need not germinate and spread before we may employ our preemption doctrine to halt its growth.
¶53         In sum, I believe our ultimate focus in assessing preemption by operational conflict centers on whether the local law will materially impede the state’s interest concerning the regulated matter. This standard affords courts the latitude necessary to practically assess whether the local and state laws at issue may coexist effectively. I turn now to the question of whether Ordinance 34 materially impedes, and therefore is preempted by, state law.
II. Ordinance 34 is Preempted by State Law
¶54         The federal district court concluded that “the operational effect of . . . Ordinance 34 impermissibly conflicts with the application and effectuation of the state interest in the uniform treatment, management, rehabilitation and reintegration of sex offenders during and after state supervision.” Ryals v. City of Englewood, 962 F. Supp. 2d 1236, 1249 (D. Colo. 2013). It also found that, “from an operational standpoint, [Ordinance 34] conflicts with the state’s system of sentencing, parole, and probation, as well as with the state’s system of registration.” Id. at 1251. I agree.
¶55         I also believe the domino effect consideration flagged by the district court is cause for alarm and underscores the conflict attendant to ordinances like Englewood’s.
¶56         The district court found that Ordinance 34 effectively prohibits residency in Englewood for all felony sex offenders and many misdemeanor sex offenders, so long as they are required to register.[1]Id. at 1242, 1251. Ninety-nine percent of Englewood is off-limits for these offenders, and this figure does not account for whether any of the residential parcels within the remaining one percent of the city are available for sale or rent. Id. at 1241–42.[2] No person in the ordinance’s history “has ever first attempted to register at a restricted address . . . and then been able to find [a] residence in the City that does not violate Ordinance 34”; overwhelmingly, they have relocated to other cities. Id. at 1242. Police officers who enforce Ordinance 34 tell sex offenders that they cannot live in Englewood regardless of where they seek to reside. Id. In effect then, Ordinance 34 is a total ban on sex offender residency.
¶57         While Englewood understandably may think the best option for its citizens in dealing with sex offenders is simply to banish them, the State of Colorado does not have that option. In the district court’s words, “Most [sex offenders] will at some point return to the community, and there must be a place for them to live.” Id. at 1250. The state therefore has established an elaborate framework of laws to address that inevitable return. I turn there now to examine whether Englewood’s de facto ban materially impedes the state’s scheme.
A. Ordinance 34 Materially Impedes the State’s Sex Offender Scheme
¶58         Colorado law promotes public safety through an extremely comprehensive sex offender management system. Decades in the making, this statutory and regulatory system concentrates on simultaneously monitoring, rehabilitating, and reintegrating sex offenders. See, e.g., § 16-11.7-101, C.R.S. (2015). At the helm are the Sex Offender Management Board (“SOMB”) and state parole and probation authorities, which carefully oversee virtually every aspect of a sex offender’s life, from the initial decision whether to release the offender into the community to the terms and conditions dictating the offender’s existence once there.
¶59         Ordinance 34 hinders the state’s comprehensive system in at least three crucial ways: (1) it causes some sex offenders to evade the ban by registering falsely or foregoing registration altogether, thereby causing such offenders to drop off the radar that the state uses to enhance the safety of all Colorado citizens; (2) it impairs the state’s efforts to maximize public safety through individualized case management; and (3) it lays the groundwork for a “not-in-my-backyard” domino effect that will only cause these statewide public safety concerns to fester. To more plainly illustrate Ordinance 34’s interference with state law, I address and expand on each of these points in turn.
¶60         First, Ordinance 34 undermines the state’s ability to carefully oversee sex offenders through the Colorado Sex Offender Registration Act (“CSORA”), §§ 16-22-101 to -115. The state uses this centralized registration system to track offenders in order to “protect the community and . . . aid law enforcement officials in investigating future sex crimes.” See People v. Carbajal, 2012 COA 107, ¶ 37, 312 P.3d 1183, 1189. Ordinance 34 impedes registration by causing some sex offenders to register falsely or not register at all. Ryals, 962 F. Supp. 2d at 1251. Naturally, as a SOMB official testified, losing track of offenders frustrates not only the registration system but also the state’s overall sex offender management scheme. The majority ignores this evidence.
¶61         Second, Ordinance 34 undermines the state’s ability to assure the successful rehabilitation and reintegration of sex offenders into society in a way that best protects public safety.[3] In order to improve the likelihood of successful reintegration, sex offender release must be discretionary, evaluated on a case-by-case basis, and closely linked to supervision and treatment conditions specific to each offender. See §§ 18-1.3-1005 to -1009, C.R.S. (2015); see also § 17-22.5-404(1)(e), C.R.S. (2015) (recognizing connection between “offender’s likelihood of success” and “aligning the intensity and type of . . . supervision, conditions of release, and services with assessed risk and need level”). Thus, the legislature created “intensive supervision” parole and probation programs for sex offenders that “shall be designed to minimize the risk to the public to the greatest extent possible,” §§ 18-1.3-1005(2), -1007(2), and required that release into either program be conditioned on a determination that the offender “would not pose an undue threat to the community,” §§ 18-1.3-1006(1)(a), -1008(1.5). The legislature also directed the SOMB to promulgate standards for evaluating sex offenders on an individual basis and determining offender-specific conditions of release necessary to manage, monitor, and treat each offender. See § 16-11.7-103(4)(a)–(b); § 17-22.5-403(8)(b); §§ 18-1.3-204(1)(a), -1009(1)(a).  And bec ause the goals of
rehabilitation and reintegration “depend on the creation and maintenance of a stable environment and support system, close to family ties, employment, and treatment options,” Ryals, 962 F. Supp. 2d at 1250 (quoting Fross v. Cty. of Allegheny, 612 F. Supp. 2d 651, 658 (W.D. Pa. 2009)), Colorado statutes and regulations reflect the importance of placing each sex offender in a living situation designed to further that offender’s chance of success.
¶62         Before an offender is released, his or her treatment provider must make recommendations to the state parole office “regarding ongoing treatment needs, living arrangements and conditions of supervision related to the offender’s rehabilitative needs.” See Colo. Sex Offender Mgmt. Bd., Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders § 3.650(b) (2011) [hereinafter Standards and Guidelines] (emphasis added). If parole is granted, the parole office is charged with providing “supervision and assistance in securing employment, housing, and such other services as may affect the successful reintegration of the sex offender into the community . . . .” § 17-22.5-403(8)(b) (emphasis added). The scheme provides that successful reintegration can be facilitated by the support systems available in Shared Living Arrangements, see Standards and Guidelines §§ 3.170, 3.171; see also § 16-11.7-103(4)(b) (“Treatment options may include . . . shared living arrangements . . . .”), or in living with an Approved Community Support Person, see Standards and Guidelines § 5.710.[4]
¶63         The scheme further contemplates a direct state role in selecting and monitoring sex offenders’ residences. In order for an offender to show that he or she “would not pose an undue threat to the community” under section 18-1.3-1006(1)(a), the offender must submit for approval a Parole Plan which demonstrates, among other things, that the offender’s “home living situation is free from former and potential victims” and that “[t]he appropriate level of supervision and containment is available where the offender plans to live.” Colo. Sex Offender Mgmt. Bd., Lifetime Supervision Criteria § LS 1.010(I) (1999) [hereinafter Supervision Criteria] (promulgated pursuant to § 18-1.3-1009). Offenders must receive prior approval from their supervising officer before changing residences, Standards and Guidelines § 5.620(K), and are not allowed to reside with children under age eighteen, id. § 5.620(E). If an offender is assigned to a Shared Living Arrangement, its location must be approved in advance by state officers. See id. § 3.170. In addition, state courts can require as a condition of probation that an offender reside in a particular facility or remain within the jurisdiction of the court. § 18-1.3-204(2)(a)(III), (XI). And in order for an offender on probation to receive reduced supervision or discharge, the offender must “maintain a stable and safe residence,” which is a residence that “limits the offender’s contact with victims, potential victims, and minors.” Supervision Criteria § LS 3.010(D) (promulgated pursuant to § 18-1.3-1009).
¶64         In sum, state law places in the hands of state officials the authority to select or approve a sex offender’s residence. Ordinance 34 overrides that authority by legislatively disapproving any residence located in Englewood. To me, approval by the state, plus disapproval by a locality, equals conflict. Thus, the “operational effect” of Ordinance 34—banning sex offender residency in an entire city—“would conflict” with state law by “materially imped[ing]” the state’s interest in sex offender management, rehabilitation, and reintegration. See Bowen/Edwards, 830 P.2d at 1056–57, 1059. By closing off an entire city without considering the nature of the offender in any way, bans like Ordinance 34 fail to respect the state’s individualized approach to sex offender management and materially impede the state scheme for offenders whose best chances for successful reintegration depend on residing in a city with a ban in place. Such bans force the state to deviate from individualized assessments that would otherwise lead to an offender’s placement in a banned locality.
¶65         Finally, I share the federal district court’s apprehension about the domino effect that likely will follow from this court’s approval of local residency bans. The majority seeks to downplay this concern by noting that only six Colorado cities have implemented residency bans. See maj. op. ¶ 29. What the majority fails to acknowledge, however, is that such bans have never, until now, received a Colorado court’s stamp of legal approval. Now able to hold up the majority’s opinion as a shield to costly legal challenges, other home-rule cities will almost certainly enact residency bans of their own.
¶66         The likelihood of this result, and the severity of its impact on the state’s sex offender scheme, is magnified by the fact that all six cities that currently restrict sex offender residency are located within or very near the greater Denver metropolitan area, which is home to a majority of the state’s population.[5]No longer hindered by the prospect of viable lawsuits, the remaining metro-area cities now have every incentive to pass residency bans in order to prevent sex offenders from moving into their communities. Indeed, the majority acknowledges that “[t]his is precisely why Englewood passed Ordinance 34 in the first place—as a response to the passage of a similar restriction in Greenwood Village.” Id. at ¶ 28. And an Englewood police officer testified at the trial below that Denver already has complained because Ordinance 34 causes sex offenders to move to Denver after Englewood rebuffs them.
¶67         Clearly, the state’s sex offender scheme would be materially impeded if all cities enacted bans mirroring Ordinance 34. If six is insufficient, then I wonder, where would the majority draw the line? And wherever that line falls, would the majority find preempted only those bans enacted after the acceptable quota is filled? What if only four more cities enacted bans, but those four were Denver, Colorado Springs, Aurora, and Fort Collins—the four most populous cities in the state? And if it’s assumed that there is a line beyond which the state’s sex offender scheme would be materially impeded, how can Englewood’s ban not be preempted while the final city’s ban would be? Our preemption doctrine should not condone such differentiation among coequal parts; yet, the majority’s decision sets the stage for exactly that.
* * *
¶68         These many considerations lead me to conclude that Ordinance 34 materially impedes, and therefore operationally conflicts with, the state’s sex offender scheme. Perhaps the conspicuousness of this clash helps explain why the majority seeks refuge in section 16-22-108(1)(a)(I) of the CSORA. That provision, however, cannot bear the weight of the interpretation the majority places on it.
¶69         I turn now to the reasons why.
B. Section 16-22-108(1)(a)(I) Does Not Embrace Laws like Ordinance 34
¶70         Unlike the majority, I do not believe the legislature would impose on localities the obligation to register local sex offenders’ residences while simultaneously intending that section 16-22-108(1)(a)(I) would allow such localities to completely avoid that obligation by enacting sex offender residency bans. Not only is such an interpretation debatable under the plain language of the provision, it is contradicted by the provision’s legislative history and defies common sense.
¶71         For one, I find the provision ambiguous with respect to local law enforcement agencies’ authority to reject registrants. The majority references only the latter clause of the relevant statutory sentence; but the full sentence states:
A local law enforcement agency shall accept the registration of a person who lacks a fixed residence; except that the law enforcement agency is not required to accept the person’s registration if it includes a residence or location that would violate state law or local ordinance.
§ 16-22-108(1)(a)(I). Read as a whole, it is unclear whether the exception for contrary state or local law applies to any registrant, as the word “residence” in the second clause suggests, or only those registrants who lack a fixed residence, as the sentence’s overall construction suggests. Because I find this provision ambiguous, see State v. Nieto, 993 P.2d 493, 500–01 (Colo. 2000) (“[W]here the words chosen by the legislature are . . . capable of two or more constructions leading to different results, the statute is ambiguous.”), I turn to the legislative history and consider the entire statutory scheme in order to ascertain the General Assembly’s intent, id.
¶72         This ambiguous provision was added to section 16-22-108 in 2012 by House Bill 12-1346. Ch. 220, sec. 4, § 16-22-108, 2012 Colo. Sess. Laws 817, 942. The legislature’s sole purpose in enacting H.B. 12-1346 was to address the problem that had arisen from certain localities’ decisions not to register homeless or transient sex offenders. See, e.g., Hearings on H.B. 12-1346 before the H. Judiciary Comm., 68th Gen. Assemb., 2d Sess. (Apr. 24, 2012) [hereinafter House Hearings]. Because the localities had justified their decisions based on the fact that the state’s sex offender laws then required registration only where an offender “resides,” id.; see also § 16-22-108(1)(a)(I), C.R.S. (2011), H.B. 12-1346 amended those laws to expressly require registration of offenders who “lack a fixed residence,” see Ch. 220, secs. 1–7, §§ 16-22-102 to -109, § 18-3-412.6, § 16-11-102, 2012 Colo. Sess. Laws 817, 940–46.
¶73         Nothing in the legislative history explains, or even references, the exception in the sentence added to section 16-22-108(1)(a)(I). Adding an exception to local police’s obligation to register offenders with fixed residences not only would have been extraneous to the purpose of H.B. 12-1346, it would have been counterproductive. After all, the bill’s purpose was to broaden the scope of localities’ registration obligations. In light of this purpose, had the legislature intended for H.B. 12-1346 to create a new exception to localities’ obligation to register fixed-residence offenders, it is difficult to believe the bill would have passed through both the House and Senate without any mention of that fact. See House Hearings; Hearings on H.B. 12-1346 before the S. Judiciary Comm., 68th Gen. Assemb., 2d Sess. (May 4, 2012).
¶74         And even if the legislature did intend to create such an exception, I see nothing to suggest that it intended to accommodate decisions by localities to shut out sex offenders entirely. CSORA sets forth a top-down system of requirements and protocols to establish a centralized, accessible, and effective registration program and ensure that sex offenders are monitored in a coordinated manner. It tasks local law enforcement agencies with numerous information-sharing, notification, and verification duties and requires that such agencies report to state-level organizations. See, e.g., §§ 16-22-106(3); -107(3)–(4); -109(1), (3)–(3.5), (5); -110(4). It makes little sense that the legislature would enlist local police as a cog in this statewide system while at the same time contemplating that localities could unilaterally remove themselves from the system by passing self-exclusionary ordinances.
¶75         For these reasons, I do not believe the General Assembly intended to embrace local bans on sex offender residency when it enacted the current language in section 16-22-108(1)(a)(I). I therefore reject the majority’s repeated resort to that provision as evidence that state law contemplates, and even clears the way for, laws like Ordinance 34.
III. Conclusion
¶76         The sum of these considerations leads me to conclude that Ordinance 34, and local sex offender residency bans in general, materially impede, and therefore operationally conflict with, the state’s sex offender scheme. I therefore would find Ordinance 34 preempted and would answer the certified question in the affirmative. Accordingly, I respectfully dissent from Part II.D of the majority opinion.
I am authorized to state that JUSTICE GABRIEL joins in this concurrence in part and dissent in part.

[1] All sex offenders who must register may be, and some are, required to do so for the remainder of their lives. See § 16-22-113(1), C.R.S. (2015) (allowing sex offenders to petition the court for discontinuance of the registration requirement after a prescribed time period); § 16-22-113(3) (listing sex offenders who are never eligible for discontinuance of the registration requirement).
[2] An Englewood Police Department handout warns that, if offenders attempt to inquire about these parcels’ availability with their current occupants, the offenders may be contacted by police and charged with trespassing. Ryals, 962 F. Supp. 2d at 1242.
[3] Whether, and how, offenders should be reintegrated is not at issue. The legislature long ago determined that “keeping all sex offenders in lifetime incarceration imposes an unacceptably high cost in both state dollars and loss of human potential,” and that “some sex offenders respond well to treatment and can function as safe, responsible, and contributing members of society, so long as they receive treatment and supervision.” § 18-1.3-1001, C.R.S. (2015). It therefore concluded that sex offenders, like other offenders, should be released on parole or probation when appropriate. See §§ 18-1.3-1006, -1008 (addressing parole and probation, respectively). The goal of parole and probation is to help rehabilitate offenders and ensure their successful reintegration into society by assisting with that transition. See, e.g., § 18-1.3-204(1)(a) (stating that probation is designed “to ensure that the defendant will lead a law-abiding life and to assist the defendant in doing so”); § 17-22.5-102.5(1)(c), C.R.S. (2015) (stating that one purpose of parole is to “promote rehabilitation by encouraging the successful reintegration of convicted offenders into the community while recognizing the need for public safety”).
[4] The definition of Approved Community Support Person states:
Approved Community Support Person provides positive support for change efforts and may accompany the offender in approved activities that do not involve minor children. Someone significant to the offender and/or a roommate who attends treatment with the offender, has a positive relationship with the supervising officer and treatment provider, and is well versed in and supportive of the offender’s supervision and treatment requirements.
Standards and Guidelines § 5.710 (emphasis added).
[5] The five cities other than Englewood are Castle Rock, Commerce City, Greeley, Greenwood Village, and Lone Tree. Ryals, 962 F. Supp. 2d at 1247 n.6.